Dale WALKER, et al.,
Plaintiffs-Appellees,

v.

Charles ROWE and David Sandahl,
Defendants-Appellants.

No. 85–2057.

United States Court of Appeals,
Seventh Circuit.

Argued April 18, 1986.
Decided May 19, 1986.

Bart T. Murphy, Office of Ill. Atty. Gen., Chicago, Ill., for defendants-appellants.

Terry Ekl, Connolly & Ekl, Hinsdale, Ill., for plaintiffs-appellees.

Before CUMMINGS, Chief Judge, EASTERBROOK, Circuit Judge, and NOLAND, District Judge.*

EASTERBROOK, Circuit Judge.

The Pontiac Correctional Center is the maximum security prison of Illinois. On July 22, 1978, inmates of Pontiac who were being returned to their cells after exercise in the courtyard killed three guards, in-

---

* The Honorable James E. Noland, Chief Judge of the United States District Court for the Southern   District of Indiana, is sitting by designation.

jured others, and set fire to part of the prison. Three of the injured guards, and the estates of the three deceased guards, filed this suit against Charles Rowe, then the Director of the Illinois Department of Corrections, and David Sandahl, the Assistant Warden of Operations at Pontiac. They contended that Rowe and Sandahl (together with others since dismissed from the suit) deprived them of their constitutional right to a safe working environment. The jury returned verdicts aggregating $706,845, to which the district court added $145,792 in attorneys' fees and costs. These recoveries came on top of workers' compensation awards and other benefits afforded by state law.[1] Because we conclude that the constitution is not a code of occupational safety, we reverse the judgments.

## I

■ One preliminary matter. The defendants maintain that the suit is one against the state and therefore barred by the eleventh amendment. Certainly so if the suit is against the defendants in their "official capacity," but the "capacity" in which litigation proceeds is largely the plaintiff's choice. If the theory is that the defendant occupied a given office, and the occupant of that office had a duty (one attaching to any occupant of the office) to do such-and-such, then we have an "official capacity" suit. It avoids the immunities that apply to "individual capacity" suits but is likely to be brought up short by the eleventh amendment. See *Kentucky v. Graham*, — U.S. —, 105 S.Ct. 3099, 3105–06, 87 L.Ed.2d 114 (1985). If the theory is that the defendant did something that is tortious independent of the office

the defendant holds, we have an "individual capacity" suit.

The plaintiff may plead a claim either way, and if he pleads what is naturally an official capacity suit as an individual capacity suit, he avoids the eleventh amendment but confronts a fatal problem—inability to prove personal responsibility. *Duckworth v. Franzen*, 780 F.2d 645, 649–50 (7th Cir. 1985). The plaintiff who says that the occupant of a given office should have done something (by virtue of office) but neglected to do it fails for two reasons: most provisions of the bill of rights do not forbid simple neglect, see *Daniels v. Williams*, — U.S. —, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (due process); *Whitley v. Albers*, — U.S. —, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (eighth amendment), and the constitution does not make supervisory officeholders vicariously liable for the acts and omissions of their subordinates, see *Ustrak v. Fairman*, 781 F.2d 573, 575 (7th Cir. 1986); *Duckworth*, 780 F.2d at 650; *McKinnon v. City of Berwyn*, 750 F.2d 1383, 1390 (7th Cir.1984).

Many of the grounds on which the guards sought to collect damages fail because, if they do not seek to attach liabilities to the office, they seek to hold the defendants responsible for the acts or omissions of others. The plaintiffs say, for example, that Pontiac was unsafe because:

- The prison had "dead spots" hidden from guard towers
- There were too few guards, and 56 authorized positions were vacant because of high turnover
- The prison was overcrowded, with 1,962 inmates in 1,200 cells

---

1. The estates of two guards recovered burial expenses plus $250,000 apiece in workers' compensation death benefits. See Ill.Rev.Stat. ch. 48 § 138.7. The third estate was eligible for this benefit but did not request it. All three estates received death benefits under life insurance policies paid for by the state, and all were entitled to an extra $20,000 under the Illinois Law Enforcement Officers and Firemen's Act, Ill.Rev. Stat. ch. 48 § 281–85. The three injured guards received their full salaries during their recuperation, under the Disability from Injuries in Line

of Duty Act, Ill.Rev.Stat. ch. 70 § 91. The state was required to pay the full medical expenses of the injured guards under the workers' compensation program, and the parties settled these claims for lump sums. All six plaintiffs also pursued their remedy in the Illinois Court of Claims. The court dismissed their suit, holding the workers' compensation remedies exclusive. *Thomas v. Illinois*, 33 Ill.Ct.Cl. 289 (1980). The guards also could have sued the prisoners who did the deeds, but they did not, doubtless thinking the prisoners judgment proof.

- Some of the inmates had formed gangs, and in general "the inmates clearly were in charge" of the prison
- The phone system was new, hard to use, and had defects
- The door and "cage" in the North Cell House were old and flimsy
- The guards did not receive enough training in controlling riots, and the existing training was poor

These and similar complaints have to do with the prison system as a whole. They do not fix individual responsibility on Director Rowe, who did not design a prison with "dead spots," or an Assistant Warden Sandahl, who could not refuse to accept prisoners committed by the courts. They are either attempts to fasten liability on the office, which the eleventh amendment forbids, or attempts to impose vicarious liability on Rowe and Sandahl. Either way, these complaints cannot be the foundation of liability.

## II

Some of the acts in question are at least colorably the personal responsibility of the defendants. The jury might have found the following, among other things, and it might have connected these to the decisions of Rowe and Sandahl:

- Although Pontiac had metal detectors, they were not operational
- Although prisoners were known to make weapons in the metal shop, prison officials did not conduct enough random shakedowns of the inmates' cells to find the weapons, and the request of the guards' union for more shakedowns was "not immediately accepted"
- Although Sandahl should have known that the prison was tense, he allowed it to operate on a normal routine instead of "locking down" the prison (that is, locking inmates in their cells)
- When Sandahl (who was at home) learned that a riot was in progress, he did not immediately issue shotguns to the tactical squad and order it to quell the disturbance; instead Sandahl put

Major Lowery in charge, and Major Lowery did not issue shotguns until Sandahl arrived and ordered their issuance more than an hour later

Our question is whether acts and omissions of this character, which arguably increased the danger to which the guards were exposed, violate the constitution. The district court held that they do, both before trial, when it denied a motion to dismiss, see 535 F.Supp. 55, 58 & n. 5 (N.D.Ill.1982), and after trial, when it denied a motion for judgment n.o.v. We may assume that Rowe and Sandahl knew that these acts and omissions increased the risk of injury facing the guards and after full deliberation decided to do nothing. We may assume that the decision to accept these risks was negligent, meaning that the costs of reducing the risks were less than the benefits (the harms avoided, discounted by the probability that there would be a riot). We may even assume that the decision to accept these risks was grossly negligent (meaning that the costs were substantially less than the anticipated benefits). The answer to the question is no, under any of these assumptions.

■ The defendants did not kill or injure the guards; prisoners did, and this makes all the difference. See *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980). To see why, consider the language of the due process clause of the fourteenth amendment, on which the guards rely: "[N]or shall any State *deprive* any person of life, liberty, or property, without due process of law ..." The constitution requires the state to grant "process" before it deprives people of life, liberty, or property. It is a constraint on the state's power to act, a prohibition on the misuse of official power. *Daniels v. Williams,* 106 S.Ct. at 665–66. It does not require the state to guarantee life, liberty, or property against invasion by private actors; it requires only that the state not act, unless with due process, when life, liberty, or property are in the balance.

■ "Due process" does not mean "due care." *Davidson v. Cannon,* ——

U.S. ——, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986). We concluded in *Bowers v. DeVito,* 686 F.2d 616 (7th Cir.1982), that because the bill of rights is a charter of negative liberties, the state need not protect people from danger. See also *Hinman v. Lincoln Towing Service, Inc.,* 771 F.2d 189, 194 (7th Cir.1985). *Bowers* held that the state has no constitutional obligation to keep aggressive people out of free society. Subsequent cases have held, among other things, that the police have no constitutional duty to save people in danger. *Beard v. O'Neal,* 728 F.2d 894, 899 (7th Cir.) (person known to be threatened by criminal), *cert. denied,* —— U.S. ——, 105 S.Ct. 104, 83 L.Ed.2d 48 (1984); *Jackson v. City of Joliet,* 715 F.2d 1200 (7th Cir.1983) (person in burning car), *cert. denied,* 465 U.S. 1049, 104 S.Ct. 1325, 79 L.Ed.2d 720 (1984). The bill of rights is designed to protect people from the state, not to ensure that the state supplies minimum levels of safety or comfort.

Governments regularly sacrifice safety for other things. A city may decide to spend more money on parks or education and less on police, even though its officials know that the expenditure on police would reduce the cost of crime by more than the expenditure on the police. It may do this without answering in damages to people subsequently mugged in the parks. The police department may decide to hire more police and give each one less costly equipment. One predictable result is that the police will suffer more auto accidents in high speed chases than they would if the city used sports cars as patrol vehicles. The city may choose the kind of car it will furnish to the police without explaining to a jury in a § 1983 suit why it picked Chevrolet sedans rather than safer and faster Audi 5000 Turbo Quattros. The level of safety to be provided *by* the police to the people—like the level of safety to be provided *to* the police and prison guards—is determined by political and economic forces, not by juries implementing the due process clause. People through the democratic process may choose more or less "crime in the streets" by altering their

support of the police, the courts, social welfare programs, and economic policies stimulating growth; so too they may alter their support of safety programs for prison guards. And they may choose how to deal with the risks that inhere in prisons—they may choose to provide greater safety through designing new prisons and doubling the number of guards, or they may choose to afford remedies such as workers' compensation, insurance, and special payments to injured guards.

The safety of guards and other employees of the state is affected as much by the guards themselves as by the choices made by the state. Would-be guards must decide whether to take the job—with a given mix of salary, safety, and compensation for injury—or to seek work elsewhere. The state may not dragoon people to be guards. Would-be guards, represented by their labor unions, may decide to accept a little less safety in exchange for a little higher pay. Cf. *Camacho v. Ritz-Carlton Water Tower,* 786 F.2d 242 (7th Cir.1986). Having decided that the combination of pay, benefits, and safety is satisfactory, the guards cannot turn around and say that the constitution required that safety be a larger component of the total package. The constitution no more assures a safe job than it does a job with a generous salary. Cf. *Vance v. Bradley,* 440 U.S. 93, 101–02, 106–09, 99 S.Ct. 939, 944–45, 947–49, 59 L.Ed.2d 171 (1979).

■ The constitution does not assure employees of the government better terms or working conditions or amenities than those available in private employment. *May v. Evansville-Vanderburgh School Corp.,* 787 F.2d 1105, 1108–11 (7th Cir. 1986). True, some portions of the constitution regulate the public employment relationship. For example, a public employee may not be fired for speech on matters of public concern, and he must be given an appropriate hearing before being fired if he has a "property" interest in his job. But none of these particular rules is involved in this case. We therefore hold that the due process clause does not assure safe work-

ing conditions for public employees. Accord, *McClary v. O'Hare,* 786 F.2d 83, 88–89 (2d Cir.1986).[2] Cf. *Hayes v. Vessey,* 777 F.2d 1149, 1151–52 (6th Cir.1985) (assuming that an employee has a constitutional right to be free of rape in the workplace but holding that workers' compensation remedies under state law are sufficient "process" for unauthorized, criminal acts at work). See also *Daniels v. Williams, supra; Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); and *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), all holding that the constitution does not duplicate duties of care in the common law of torts.

This conclusion may seem in tension with the rule that the state must protect prisoners and others in its charge. See *Davidson v. Cannon* (assuming that harm caused by an attack that could have been prevented, but because of wrongful intent or deliberate indifference was not, might be basis of liability under the due process clause); *Watts v. Laurent,* 774 F.2d 168, 172 (7th Cir.1985) (holding this), *cert. denied,* — U.S. —, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986); *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (eighth amendment requires state to exercise some care in affording medical assistance to prisoners). See generally *Duckworth v. Franzen,* 780 F.2d at 651–56. The district court drew on these and related cases when denying the defendants' motion for judgment n.o.v., stating that although these "deliberate indifference" cases are based on the eighth amendment, "the broader due process analysis is not limited to prisoners." It is not "limited to prisoners," but it is limited by the rationale for requiring the state to furnish protection. These cases are based on the principle that when the state takes someone into its care or cuts off sources of private aid, the state must afford replacement protection. So when the state imprisons a person and prevents his ambling down to the family physician, the state must provide some medical care. When the state arrests the adult having custody of a child, the state had better take care of the child. *White v. Rochford,* 592 F.2d 381 (7th Cir.1979). Sometimes we shorten this inquiry to a search for a "special relationship" between the state and the person to be protected. *Ellsworth v. City of Racine,* 774 F.2d 182, 185 (7th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986). Whatever the name, the rationale lies in constraints the state imposes on private action. *Gilmore v. Buckley,* 787 F.2d 714, 722 (1st Cir.1986). As the court put the point in *Bowers,* 686 F.2d at 618, all of these cases are variations on the principle that "[i]f the state puts a man in a position of danger from private persons and then fails to protect him ... it is as much an active tortfeasor as if it had thrown him into a snake pit." If a press gang had picked up people from the streets and forced them to be guards at Pontiac, this line of cases would require the state not to be indifferent to the guards' working conditions. But the state did not draft its guards; they enlisted, on terms they found satisfactory, and they were free to quit whenever they pleased. The state must protect those it throws into snake pits, but the state need not guarantee that volunteer snake charmers will not be bitten. It may not throw Daniel into the lions' den, but if Daniel chooses to be a lion tamer in the state's circus, the state need not separate Daniel from his charges with an impenetrable shield.

■ A contrary holding would make the warden's life parlous indeed. The guards

**2.** *McClary* was brought by the estate of a construction worker killed when a wire cable on a crane broke, bringing the boom down on the worker. The estate argued that the state "deliberately disregarded and violated state laws, rules, and regulations for occupational safety and the operation of mobile cranes thereby creating a high risk of danger to the decedent" (786 F.2d at 85). The Second Circuit held that even "deliberate" exposure of public employees to "high risk" does not violate the constitution because it is not an abuse of governmental power. "[W]hatever abuses O'Hare committed were abuses of authority that he held as an employer; identical actions could have been carried out by a private employer.... We do not think that improper actions taken by employers violate an employee's [constitutional] rights simply because the employer is a government official." *Id.* at 89.

say that Director Rowe and Assistant Warden Sandahl must pay damages because they did not have enough "shakedowns" of cells in 1978 looking for weapons. But until the Supreme Court decided *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), a warden risked liability to the prisoners under the fourth amendment every time he ordered a shakedown. The guards say that Sandahl should have "locked down" the prison to reduce the risk of violence. But Pontiac had been locked down for six of the ten weeks preceding the riot, and the eighth amendment may have something to say about keeping prisoners locked two to a cell for weeks or months on end out of an unverifiable fear that if they were let out to exercise there might be trouble. Compare *Caldwell v. Miller*, 790 F.2d 589 (7th Cir.1986), with *French v. Owens*, 777 F.2d 1250, 1251–56 (7th Cir.1985). The guards say that Sandahl, reached by phone at home, should have ordered the tactical squad to be armed with shotguns and sent into the troubled part of the prison immediately. But if the shotguns had been used, Sandahl quickly would have been charged with constitutional torts against the victims. *Whitley v. Albers* holds that prison officials may use weapons to quell disturbances if they reasonably conclude that this is the best way to save the lives of all; the Court did not hint that orders hastily issued from an Assistant Warden's living room would meet this standard.

Pontiac is a den of murderers, rapists, and others with no respect for the law— and all too often nothing to lose from further mayhem. Cf. *United States v. Fountain*, 768 F.2d 790, 793–94, 803–04 (7th Cir.1985). If there are few guards, the prisoners will murder each other; if the guards are present in abundance, the guards may become the targets; if the guards lock the prisoners in their cells, all will suffer to prevent violence by a few. There is no solution within the reach of a federal court, no easy recourse in the due process clause of the fourteenth amendment. The state has many choices, all costly, many bound to end in tragedy for some-

one. It may make these tragic choices for itself.

REVERSED