7 F.3d 1405
 Eladio T. FIGUEROA, et al., Plaintiffs-Appellees,
v.
UNITED STATES of America, A.D. Loizeaux, G.E. Monroe, T.J.
Johnson, et al., Defendants-Appellants.
Eladio T. FIGUEROA, Leo A. Abilo; Bartolome E. Abuan, Romeo
A. Acejo, et al., Plaintiffs-Appellants,
v.
UNITED STATES of America, et al., Defendants-Appellees.
 Nos. 92-15914, 92-16602.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 15, 1993.
Decided Oct. 19, 1993.
 
 Edward R. Coulson, Bennet A. McConaughy, Joseph E. Delaney, Foster, Pepper & Shefelman, Seattle, WA, for plaintiffs-appellants/plaintiffs-appellees.
 Stuart M. Gerson, Asst. Atty. Gen., Frederick A. Black, U.S. Atty., Barbara L. Herwig, Richard Montague, Attys., Civ. Div., U.S. Dept. of Justice, Washington, DC, for defendants-appellants.
 Stuart M. Gerson, Asst. Atty. Gen., Frederick A. Black, U.S. Atty., J. Patrick Glynn, Director, JoAnn J. Bordeaux, Deputy Director, Paul M. Honigberg, Judith N. Macaluso, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, DC, for defendant-appellee U.S.
 Appeal from the United States District Court for the District of Guam.
 Before: WALLACE, Chief Judge, and D.W. NELSON and O'SCANNLAIN, Circuit Judges.
 D.W. NELSON, Circuit Judge:
 
 
 1
 In May of 1987, an electrical transformer ruptured at the Piti Power Plant on the United States Naval Base in Guam, releasing a variety of toxic chemicals. Subsequently, 251 federal employees who were at the plant at the time of the accident filed suit against the United States and twelve individuals who supervised the toxic spill clean-up. Plaintiffs brought five causes of action against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-80 ("FTCA"). Their Sixth cause of action was directed at the individual Defendants and alleged a substantive due process claim for tortious conduct. All Plaintiffs' claims stemmed from their allegations that Defendants were negligent or grossly negligent: 1) in ordering Plaintiffs to clean-up the polychlorinated biphenyls chemicals and to return to work without advising them about appropriate protective measures or securing the area; and 2) in not providing proper medical care immediately after the explosion. Plaintiffs sought damages for current and potential future physical injuries and for emotional distress resulting from their fear that they would develop cancer at some future date.
 
 
 2
 The government moved to dismiss all claims against it on the ground that these claims were preempted by the Federal Employees' Compensation Act, 5 U.S.C. § 8101 et seq. ("FECA"). The individual Defendants moved for dismissal of the constitutional tort claim on the ground of qualified immunity. The district court granted the government's motion based on its judgment that the FECA coverage question should be resolved by the Secretary of Labor ("Secretary"). The district court denied the individual Defendants' motion. All parties timely appeal.
 
 Discussion
 I. FECA Preemption
 
 3
 Under FECA, federal employees are compensated for injuries sustained during the performance of their duties. The remedies provided under FECA are exclusive of all other remedies against the United States for job-related injury or death. 5 U.S.C. § 8116(c).
 
 
 4
 There are two sorts of FECA coverage questions. The first question is whether FECA covers a particular type of injury. This is a question of "the scope of coverage." Sheehan v. United States, 896 F.2d 1168, 1174 (9th Cir.), modified, 917 F.2d 424 (9th Cir.1990). The second question is whether a plaintiff is entitled to compensation under the facts of a particular event. This question requires a determination of such facts as " 'whether the injury ... occurred while the employee was on the job.' " Id. (quoting Griffin v. United States, 703 F.2d 321, 322 (8th Cir.1983). This is a question of "coverage in and of itself." Id. (internal quotations omitted).
 
 
 5
 In this case, the district court dismissed Plaintiffs' FTCA claim on the ground that there was a question of FECA preemption concerning Plaintiffs' alleged injuries which should be resolved by the Secretary of Labor. Plaintiffs appeal from this dismissal, arguing that under Sheehan this is a question of scope of coverage and the district court was therefore required to resolve the question itself. Defendant counters that this case is more akin to Reep v. United States, 557 F.2d 204 (9th Cir.1977), under which the district court correctly deferred the question of coverage to the Secretary. Id. at 207-208.
 
 
 6
 Sheehan held that when there is a question about the scope of FECA coverage, this question should be resolved by the district court and Reep's instruction to defer coverage questions to the Secretary "does not apply." 896 F.2d at 1174 (internal quotations omitted). Rather, Reep only applies when there are questions about whether a particular factual circumstance falls under FECA. Id. In Sheehan, however, the plaintiff's claim was not colorable under FECA as a matter of law. Sheehan's holding regarding who should resolve a FECA scope of coverage question rested upon this court's judgment that the alleged emotional distress was "divorced from any claim of physical harm." Id. Thus Sheehan stands only for the proposition that when a plaintiff has failed to allege a colorable claim under FECA as a matter of law, the district court should render a judgment. We do not read Sheehan as altering the general rule that when a claim arguably falls under FECA, the question of coverage should be resolved by the Secretary. See Reep, 557 F.2d at 207.
 
 
 7
 In this instance, Plaintiffs' claims are colorably under FECA. Plaintiffs' alleged mental distress injuries are tied to physical harm, both potential and actual. As a result of their exposure to the PCBs, and after suffering some medical problems, Plaintiffs are concerned about developing cancer. Under FECA, an occupational disease or illness includes:
 
 
 8
 a condition produced in the work environment over a period longer than a single work day ... by such factors as ... continued or repeated stress or strain; or exposure to hazardous elements such as, but not limited to, toxins, poisons, fumes ... or repeated conditions ... of the work environment.
 
 
 9
 20 C.F.R. § 10.5(a)(16). FECA thus contemplates coverage for a condition produced over a long period of time by "stress" or as a result of being exposed to a "toxic" substance that may cause future harm. Arguably, mental distress is a form of stress. It takes only a small step to conclude that FECA also contemplates coverage for a condition of emotional distress that results from the stress of being exposed in a discrete event to a toxic substance that could cause future physical harm.
 
 
 10
 Moreover, the Department of Labor has determined that emotional distress may be considered a disability when it arises "from [a worker's] emotional reaction to ... a requirement imposed by the employment." In re Lillian Cutler & Dept. of Labor, 28 Dig. & Dec.Empl.Comp.App.Bd. 125 (1979); Castro v. United States, 757 F.Supp. 1149, 1151 (W.D.Wash.1991) (observing that FECA covered emotional distress claims that arose from a "reaction to ... regular or specially assigned work duties"); Burke v. United States, 644 F.Supp. 566, 568 (E.D.La.1986) (discussing Assistant Administrator of Labor's official affirmative response to whether job-related mental distress fell under FECA) (emphasis supplied). Accordingly, the district court properly dismissed plaintiffs' FTCA claims in order to allow the Secretary to resolve the question of whether or not the claims are covered by FECA.
 
 II. Qualified Immunity
 
 11
 Ordinarily, the denial of a 12(b)(6) motion is not a reviewable final order; it is only when a question of immunity is involved that we use the collateral order doctrine to exercise jurisdiction. We review the district court's denial of a 12(b)(6) motion de novo. Fresno Rifle and Pistol Club, Inc. v. Van De Kamp, 965 F.2d 723, 725 (9th Cir.1992). We assume the truth of the complaint's well-pleaded factual allegations and construe them in the light most favorable to the plaintiff. Oscar v. University Students Coop. Ass'n, 965 F.2d 783, 785 (9th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992). A 12(b)(6) motion should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).
 
 
 12
 The twelve individual Defendants argue that the district court erred in denying their motion to dismiss since the Plaintiffs' constitutional claim is not cognizable under the due process clause. In the alternative, Defendants argue that they are entitled to qualified immunity. We need only deal with the latter challenge.
 
 
 13
 "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In order to proceed in their suit against the individual Defendants, Plaintiffs must have alleged a violation of a right that was clearly established in 1987 at the time of the accident. Siegert v. Gilley, 500 U.S. 226, ----, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991); Anderson v. Creighton, 483 U.S. 635, 639-40, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). In addition, the contours of that right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640, 107 S.Ct. at 3039.
 
 
 14
 Defendants argue that Plaintiffs' substantive due process claim is essentially a claim that they were deprived of a safe workplace. Plaintiffs counter that they are alleging a violation of their more general liberty interest not to be placed in a position of danger by government actors. Thus, we must decide whether to characterize Plaintiffs' claim as alleging acts of commission or omission. This is a difficult question. The line between the two types of conduct can easily become blurred. See, e.g., White v. Rochford, 592 F.2d 381, 384 (7th Cir.1979) (it is a "tenuous metaphysical construct which differentiates sins of omission and commission"). Nevertheless, we think a line can be drawn. Plaintiffs claim that they were exposed to danger as a result of Defendants' actions in ordering them to clean-up after the explosion and thus that Defendants played more than a passive role. See, e.g., Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir.1982). We agree with the district court that these are allegations of affirmative conduct. However, the district court failed to consider that in 1987 a right not to be placed in danger by a government actor was contingent upon that actor first depriving an individual of his liberty.
 
 
 15
 In determining whether Plaintiffs had a clearly established right in 1987 not to be placed in danger by a government employer, we "survey the legal landscape" as it existed in 1987. Wood v. Ostrander, 879 F.2d 583, 591 (9th Cir.1989), cert. denied, 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990). We begin by looking at those cases that are "most like" the instant case. Id. at 592. However, the exact situation need not have been the subject of a prior case. Rather, if there are cases establishing a clear constitutional right, the question for this court is whether those cases are meaningfully distinguishable from the instant case. Id. at 591-93. In the "absence of binding precedent," we look to all available decisional law. See Capoeman v. Reed, 754 F.2d 1512, 1514 (9th Cir.1985). This "includes cases from state courts, other circuits and district courts." Wood, 879 F.2d at 591. If there is no law that is binding for this circuit and there are few cases on point, "an additional factor that may be considered in ascertaining whether the law is clearly established is a determination of the likelihood that the Supreme Court or this circuit would have reached the same result as the non-binding authorities at that time." Id. at 593 (internal quotations omitted).
 
 A. Walker and McClary
 
 16
 The case most factually similar to this one is from the Seventh Circuit. In Walker v. Rowe, 791 F.2d 507 (7th Cir.), cert. denied, 479 U.S. 994, 107 S.Ct. 597, 93 L.Ed.2d 597 (1986), several state prisoners attacked and killed three guards and injured several others. Some of the injured guards and the estates of the three deceased guards brought suit claiming that prison officials had deprived them of their right to a safe working environment by affirmatively "act[ing]" to "increase[ ] the danger" faced by the guards. Id. at 509 (emphasis supplied). We observe that the district court failed to consider Walker because it wrongly considered it to be a case that dealt with acts of omission.
 
 
 17
 Although the Seventh Circuit recognized that in some situations a government actor had a duty not to engage in acts or omissions which placed an individual in a position of danger, id. at 511, the court dismissed the guards' claims. The decision turned upon the fact that the creation of danger did not result from a governmental curtailment of the guards' freedom to act on their own behalf. Id. at 510-11. The guards had not been "dragoon[ed]" or "forced" into their jobs. Id. While employers do compel their employees to some degree, there was no governmental compulsion such as when a "state imprisons a person" or "[w]hen the state arrests the adult having custody of a child," that forced the guards to face dangers that most people would choose to avert. Id. at 511. Accordingly, in 1986 the Seventh Circuit recognized that there was a due process right not to be exposed to danger when a governmental restriction on an individual's freedom had created the initial danger and then the government had done nothing to help the individual. This right was based on the maxim that "[t]he state must protect those it throws into snake pits." Id. at 511. Conversely, the Seventh Circuit did not recognize a substantive due process right when the government had created or "increased" the danger faced by an individual but had done nothing to restrict the individual's freedom to avert that danger. Id. at 509-10.[1]
 
 
 18
 The Second Circuit engaged in a similar analysis in McClary v. O'Hare, 786 F.2d 83 (2d Cir.1986), which concerned the death of a state employee as a result of a work-related accident. The deceased plaintiff's estate brought a substantive due process claim against plaintiff's supervisor, alleging that he had intentionally failed to follow the safety procedures that would have averted the accident. Id. at 84-85. The Second Circuit affirmed the dismissal of the claim, stressing that there was no allegation that the deceased had been in the state's control at the time of his death.[2] Id. at 88-89.
 
 
 19
 Accordingly, during the relevant time period, the law was more complex than either party or the district court acknowledges. On the one hand, there was no clearly established general constitutional right not to be exposed to danger by a government actor irrespective of whether that exposure was cast in terms of an act of commission or omission. On the other hand, there was a clearly established right not to be exposed to danger if a government actor had first taken some action to restrain a person's liberty. In 1987, the question of whether a defendant had engaged in affirmative conduct went to the issue of restraint. If such a restraint had occurred, however, it did not matter whether the resulting danger occurred due to a failure to act or to a purposeful action. See Bowers, 686 F.2d at 618 ("[i]f the state puts a man in a position of danger ... and then fails to protect him, it will not be heard to say that its role was merely passive") (emphasis supplied).
 
 
 20
 B. Precedential Effect of Walker and McClary
 
 
 21
 Although Walker, and to a lesser extent McClary, are factually similar to the present case, neither decision is binding authority in this circuit. Thus we must address whether there is any indication that in 1987 this circuit or the Supreme Court would have disagreed with the Seventh and Second circuits and found that a government official had a clearly established duty not to expose an individual to danger, irrespective of whether or not the government actor had restrained that individual's liberty.
 
 
 22
 The district court relied upon three cases to support its judgment that the Defendants were not entitled to qualified immunity.[3] The district court relied upon our decision in Wood, 879 F.2d at 583, which is considered to be the beginning of "danger creation" cases in this circuit. See L.W. v. Grubbs, 974 F.2d 119, 121 (9th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993), Wood, in turn, followed the Seventh Circuit decision in White, 592 F.2d at 381, the second case relied upon by the district court. Neither Wood nor White, however, demonstrates that there was a clearly established right in 1987 not to be exposed to danger by a government actor without some initial governmental restriction upon a person's liberty.
 
 
 23
 In White, the police arrested a gentleman on the freeway and abandoned his young niece and two nephews in the car which was left on the freeway. Id. at 382. The Seventh Circuit held that the children had a due process liberty right not to have been stranded. Id. at 383-85. Rather, the police should have brought the children to a safe location. Id. White stands for the proposition that "[w]hen the state arrests the adult having custody of a child, the state had better take care of the child." Walker, 791 F.2d at 511 (emphasis supplied).
 
 
 24
 In Wood, the plaintiff was a passenger in a car that had been pulled over by the police at 2:30 a.m. The police arrested the driver, impounded the car, instructed the passenger to leave the car, and then refused to give her a ride out of the area. She was later raped by a third party. 879 F.2d at 586. Also faced with a qualified immunity defense, Wood concluded that in 1984 the Ninth Circuit would have followed White, id. at 594, and that by 1984 "passengers of arrested drivers" had a clearly established substantive due process right not to be "abandon[ed]" by police officers and thereby exposed to danger. Id. at 593.
 
 
 25
 In addition to White, Wood also stated that, in 1984, this court most likely would have embraced the "logic" of two other relevant Seventh Circuit decisions: Jackson v. City of Joliet, 715 F.2d 1200 (7th Cir.1983), cert. denied, 465 U.S. 1049, 104 S.Ct. 1325, 79 L.Ed.2d 720 (1984), and Bowers, 686 F.2d at 616. Wood, 879 F.2d at 594. In Bowers, the deceased plaintiff's estate alleged that the state mental health department had "recklessly" exposed the public to danger by releasing a violent mental patient who then killed deceased. 686 F.2d at 617. In Jackson, a police officer failed to come to the aid of a car crash victim who later died. 715 F.2d at 1201-04. In both cases, the Seventh Circuit refused to find a substantive due process right, notwithstanding that in Bowers the allegation could easily be characterized as an exposure to danger claim.
 
 
 26
 Wood read Bowers and Jackson as requiring that a due process exposure to danger claim must allege some restraint on an individual's or a relevant third-party's liberty, which creates a special relationship between the individual and the government officer that then triggers the defendant's duty to protect the individual from any potential harm. Wood, 879 F.2d at 593. Wood distinguished White from Jackson and Bowers on the ground that in White "the arrest created the danger" to the three children. Id. at 594 (quoting Jackson, 715 F.2d at 1204). The critical difference between Bowers, Jackson and White was that in White a deprivation of liberty had created the danger. This restriction upon the children's liberty triggered the state's duty to protect them. Id.; Jackson, 715 F.2d at 1204. In contrast, in Jackson and Bowers, the state had done nothing to interfere with the individual's liberty and thus any danger that presented itself to the plaintiff as a result of the state's action or inaction did not implicate due process.
 
 
 27
 In sum, none of the cases relied upon by the district court demonstrate that in 1987 there was a clearly established right in this circuit, or in any other circuit, not to be placed in a position of danger by a government actor absent some limitation on a person's ability to act on his own behalf to avert harm. Rather, by 1986 a person had a clearly established right not to be exposed to danger by a government actor as a result of his restricting an individual's or a relevant third party's liberty to act on his own behalf.
 
 C. Deprivation of Liberty
 
 28
 Plaintiffs are aware that absent an allegation that a government actor deprived them of their liberty, in 1987 there was no clearly established right not to be placed in a position of danger by their government employer. Plaintiffs contend that their liberty was deprived because Defendants "forced" them to clean up the toxic spill, while at the same time deliberately keeping them in a state of ignorance about the potential danger they faced. Plaintiffs contend that in 1987 this sort of conduct fell under the definition of "deprivation of liberty" because it prevented them from acting on their own behalf to avoid potential harm.
 
 
 29
 The cases from the relevant time period suggest that the courts were indeed broadening the definition of "deprivation of liberty" for exposure to danger claims. On one end of the spectrum were those cases that involved a restraint on an individual's liberty as a result of a custodial relationship. See, e.g., Estate of Gilmore v. Buckley, 787 F.2d 714, 721 (1st Cir.) (discussing custodial cases), cert. denied, 479 U.S. 882, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986). On the other end of the spectrum were those cases where a government defendant had only indirectly restrained an individual's freedom. See, e.g., White, 592 F.2d at 384-85; Ward, 737 F.Supp. at 1509-10. By 1986, many courts employed the short-hand phrase "special relationship" to describe the nexus between a government actor's possible and varied types of control over an individual's liberty that would trigger a duty not to throw that individual into a situation of danger. Estate of Gilmore, 787 F.2d at 722; Walker, 791 F.2d at 511. "Generally speaking, all of these cases [stood] ... for the proposition" that a "special relationship" is created when "the state, by exercising custody or control over the plaintiff, effectively strips her of her capacity to defend herself, or affirmatively places her in a position of danger." Estate of Gilmore, 787 F.2d at 721-22 (emphasis supplied). Other courts defined a "special relationship" as a situation where there was a pre-existing custodial relationship and distinguished this from a situation where an individual's exposure to danger was a result of his liberty being restricted in some noncustodial manner. See, e.g., Ward, 737 F.Supp. at 1510. In 1987, however, all these various types of deprivation of liberty shared a common attribute: deprivation of liberty denoted some sort of governmentally sanctioned interference with a person's physical liberty.[4]
 
 
 30
 Therefore, after surveying the legal landscape, we cannot conclude that in 1987 it was clearly established that a government employer's order to an employee to perform a dangerous task, without informing the employee about the potential harm of which the employee was ignorant, constituted a deprivation of liberty for purposes of the due process clause. See, e.g., Walker, 791 F.2d at 510; McClary, 786 F.2d at 89 (deliberate exposure of public employees to high risk does not violate the constitution when exposure does not stem from an abuse of governmental power and when "identical actions could have been carried out by a private employer"). Rather, the only clear definition of deprivation of liberty that is found in the cases is an act, direct or indirect, of governmental interference with a person's bodily liberty.
 
 
 31
 While we acknowledge that a broader understanding of deprivation of liberty may have emerged later, see, e.g., Grubbs, 974 F.2d at 121, we hold that in 1987 there was no clearly established constitutional right not to be placed in a position of danger by a government employer absent some sort of governmental restriction on an individual's physical freedom to act to avert potential harm. Defendants are thus entitled to a defense of qualified immunity as a matter of law.
 
 Conclusion
 
 32
 We affirm the district court's dismissal of Plaintiffs' FTCA claims against the United States. We reverse the district court's judgment that the individual Defendants are not entitled to qualified immunity and remand this motion for judgment in accord with this opinion.
 
 
 33
 AFFIRMED in part. REMANDED in part.
 
 WALLACE, Chief Judge, concurring:
 
 34
 I concur in part I of the opinion and in the result reached in part II. I write separately to emphasize two points.
 
 
 35
 First, as the majority correctly holds in part II.C., as of 1987, Figueroa did not have a clearly established right to be free from danger, unless a government official took some affirmative action to interfere with his physical liberty. Walker v. Rowe, 791 F.2d 507, 510-11 (7th Cir.), cert. denied, 479 U.S. 994, 107 S.Ct. 597, 93 L.Ed.2d 597 (1986); McClary v. O'Hare, 786 F.2d 83, 88-89 (2d Cir.1986); Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir.1982). In this case, the government did not restrain or otherwise interfere with the physical liberty of Figueroa or any other member of the plaintiff class. That is sufficient to decide the issue. The majority's attempt to draw a line between acts of omission and acts of commission is unnecessary to the resolution of this case and should be regarded as dicta.
 
 
 36
 Second, I disagree with the majority's characterization of the state of the law in 1987. The cases cited by the majority do not create a clearly established right "not to be exposed to danger if a government actor had first taken some action to restrain a person's liberty." Maj. op. at 1410. Instead, these cases establish a right to be free from danger created by the action of a government official that interferes with a person's physical liberty. That is an important distinction. Because our task in reviewing a qualified immunity defense is to describe accurately the state of the law, not to extend it, I cannot agree with the majority's subtle change.
 
 
 
 [1]
 As Plaintiffs point out, to some extent Walker relies upon cases which refused to find a substantive due process right when the plaintiffs alleged only that a government actor had refused to interfere to prevent danger, rather than affirmatively acting to create or increase an individual's danger. Id. at 510. The Walker court, however, conceded that in the case before it the prison officials had acted to increase the danger to its employee guards. Thus, this was not a case which turns on the distinction between acts of commission or omission
 
 
 [2]
 The district court wrongly refused to consider McClary on the ground that it was a procedural rather than a substantive due process case. As Defendants point out, however, McClary involved both a procedural and a substantive due process claim relating to a workplace injury (Blue at 25 n. 7)
 
 
 [3]
 The third case relied upon by the district court, Ward v. City of San Jose, 737 F.Supp. 1502 (N.D.Cal.1990), has since been reversed on this issue. Ward v. City of San Jose, 967 F.2d 280 (9th Cir.1991)
 
 
 [4]
 We explicitly make no holding whether in 1987 there was a right not to be exposed to danger as a result of a government actor restricting an individual's civic liberties. See, e.g., Collins v. City of Harker Heights, --- U.S. ----, ---- - ----, 112 S.Ct. 1061, 1065-66, 117 L.Ed.2d 261 (1992); Walker, 791 F.2d at 510 (in 1986 a public employee could not be threatened with a loss of his job as a result of speaking out on matters of "public concern")