[No. C052673. Third Dist. May 24, 2007.]

PATRICK O'DEA, Plaintiff and Appellant, v.
MICHAEL BUNNELL et al., Defendants and Respondents.

COUNSEL

The Scott Law Firm, John Houston Scott and Lizabeth N. de Vries for Plaintiff and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Thomas D. McCrackin and Kevin W. Reager, Deputy Attorneys General, for Defendants and Respondents.

OPINION

ROBIE, J.—As plaintiff Patrick O'Dea acknowledges, serving as a correctional officer is one of the "toughest beat[s] in the State." This is certainly true if, as plaintiff alleges, prison officials orchestrate a fight between rival prison gangs. The question we must resolve in this case is whether defendants Michael Bunnell (an associate warden at Folsom State Prison), Oliver Acuna (a captain at Folsom State Prison), and Alan Baber (a lieutenant at Folsom State Prison) deprived O'Dea (a correctional officer at Folsom State Prison)

of his liberty interests under the federal due process clause when he was injured while quelling a fight between rival prison gangs. As we will explain, the answer to this question is "no," because defendants did not restrain O'Dea's ability to act on his own behalf, even if they orchestrated the fight as O'Dea alleges. We therefore affirm the judgment dismissing the case against defendants.

## FACTUAL AND PROCEDURAL BACKGROUND

This case comes to us after a grant of summary judgment in favor of defendants. We therefore state the facts in the light most favorable to O'Dea as the party opposing the motion. (*County of Los Angeles v. Superior Court* (2002) 102 Cal.App.4th 627, 633, fn. 1 [125 Cal.Rptr.2d 637].)

O'Dea was injured while quelling a fight between rival prison gangs on April 8, 2002. In the months prior to the fight, the prison had been on lockdown because of a January riot in which the Northern Hispanic prison gang attacked the Southern Hispanic prison gang. Sometime in February, the Southerners were "return[ed] to normal programming" while the Northerners remained on lockdown.

On the morning of April 8, 2002, O'Dea was told to "stick around on the yard" because the Northerners were going to be released. At the time, O'Dea did not know there was an "unlock plan" or that a fight was anticipated between the Northerners and Southerners. O'Dea positioned himself "in the area near the yard shack and the custody ground level patio."

About 9:45 a.m., O'Dea saw Northerners being released from building 1, although he had not heard the usual radio transmission by the yard sergeant authorizing the release. The released prisoners went directly to the area of the yard where the Northerners usually congregate. Also on the yard were Southerners who had been released onto the yard earlier that morning.

The yard sergeant radioed to building 1 "that she had not called the yard yet and that she was not ready." Despite the yard sergeant's concerns, no steps were taken to stop or delay the release of the Northerners so the yard sergeant could clear the yard of the Southerners.

About 10:25 a.m., some of the Southerners began walking together toward the handball courts in the direction of the Northerners. Shortly thereafter, more Southerners moved toward the handball courts until a large group of Southerners started running toward the Northerners. The result was a fight between about 100 Hispanic inmates with the Southerners outnumbering the Northerners.

O'Dea ran toward the fight and yelled for the inmates to get down. O'Dea pepper sprayed the inmates who did not comply. When he ran out of pepper spray, O'Dea "took out [his] baton and used it." After the correctional officers quelled the fight, O'Dea remained on the yard and helped "put[] flex cuffs on inmates and provide[] security to the area."

In the afternoon, O'Dea noticed pain in his neck and arms, numbness in his fingers, and "jerk[ing] and twitch[ing]" in his chest and back muscles. In July 2002, he had neck surgery. In June 2003, he was "medically retired."

O'Dea alleged that the fight on April 8, 2002, was orchestrated by Bunnell, Acuna, and Baber. According to O'Dea's evidence, Bunnell made the decision to unlock the Northerners at a morning meeting on April 8 despite knowing that 20 inmate-manufactured weapons had been found and there was "continuing unrest" between the Northerners and Southerners. Bunnell's unlock plan was to release all inmates—including Northerners and Southerners—one tier at a time in building 1 so that staff could observe the inmates' interaction before reintegrating them onto the yard.

Acuna and Baber decided not to follow the unlock plan and instead ordered the Northerners to be released directly onto the yard before the yard sergeant had "cleared" and "called" the yard, which allowed the Southerners to remain on the yard. When Bunnell saw that his unlock plan was not being followed, he did not take action to prevent the fight, such as "recalling the yard," "putting the yard down" (i.e., stopping the release and ordering inmates to get down on the ground), or "stopping the unlock."

When Bunnell saw the Southerners moving toward the Northerners on the yard, a prison official remarked to Bunnell, "you want to put the yard down, right?" Bunnell responded, "No, not yet." Approximately 33 seconds after Bunnell decided not to put the yard down, the Southerners began running toward the Northerners and the fight began.

According to O'Dea's expert witness Michael Yarborough—a 27-year veteran and warden of the former California Department of Corrections—Bunnell's decisions on the day of the fight were "extremely reckless" and created a "foreseeable risk of harm to staff and inmates." Acuna and Baber's decisions made the fight likely to occur.

O'Dea also produced evidence which he claimed impugned Bunnell's credibility and showed that Bunnell was "beholden" to the Southerners.

Based on his evidence, O'Dea sued Bunnell, Acuna, and Baber under the federal Civil Rights Act of 1871 (42 U.S.C. § 1983 (section 1983)) claiming they deprived him of his liberty interests under the due process clause. The trial court excluded portions of O'Dea's evidence, granted summary judgment in favor of defendants, and dismissed the case. From that judgment, O'Dea filed a timely notice of appeal.

On appeal, O'Dea contends the trial court erred in granting summary judgment in favor of defendants because he created a triable issue of fact that Bunnell, Acuna, and Baber violated his right to due process when they "acted affirmatively to create a foreseeable danger in reckless disregard for [his] constitutional rights." He also contends the court abused its discretion in excluding portions of his evidence.

As we will explain, O'Dea's first contention fails because even if O'Dea's allegations against defendants are true, defendants did not restrain O'Dea's ability to act on his own behalf—the gravamen of a substantive due process claim based on the deprivation of a plaintiff's liberty interests. We therefore do not need to address his second contention regarding the court's alleged error in excluding his evidence.

## DISCUSSION

Section 1983 allows individuals to sue state actors for violating their federal constitutional or statutory rights. (*Parratt v. Taylor* (1981) 451 U.S. 527, 535 [68 L.Ed.2d 420, 428, 101 S.Ct. 1908], overruled in part on other grounds in *Daniels v. Williams* (1986) 474 U.S. 327, 330–331 [88 L.Ed.2d 662, 668, 106 S.Ct. 662].) Section 1983 " 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.' " (*Graham v. Connor* (1989) 490 U.S. 386, 393–394 [104 L.Ed.2d 443, 453–454, 109 S.Ct. 1865].) .

One of the constitutional rights cognizable under section 1983 is the right to liberty guaranteed by the due process clause of the Fourteenth Amendment.[1] (See, e.g., *Youngberg v. Romeo* (1982) 457 U.S. 307, 309, 319

---

[1] The due process clause prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law." (U.S. Const., 14th Amend., § 1.)

[73 L.Ed.2d 28, 32, 39, 102 S.Ct. 2452].) For purposes of an action for damages under section 1983, the deprivation of liberty triggering the protections of the due process clause "is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty." (*DeShaney v. Winnebago Cty. Soc. Servs. Dept.* (1989) 489 U.S. 189, 200 [103 L.Ed.2d 249, 262, 109 S.Ct. 998] (*DeShaney*).) It is on this alleged restraint of liberty that O'Dea bases his section 1983 claim.

A claim similar to O'Dea's was rejected over 20 years ago in a case brought by prison guards and their heirs against a prison director and assistant warden, where the guards had been injured and/or killed by inmates during a prison riot. (*Walker v. Rowe* (7th Cir. 1986) 791 F.2d 507, 509 (*Walker*).) The guards alleged that prison officials knew the inmates were making weapons but did not conduct enough random cell searches and did not " 'immediately accept[]' " the request by the guards' union for more cell searches; the assistant warden allowed the prison to operate normally instead of on lockdown even though he should have known the prison was "tense"; and the assistant warden "did not immediately issue shotguns to the tactical squad and order it to quell the disturbance" upon "learn[ing] that a riot was in progress." (*Id.* at p. 509.) Based on these allegations, a jury found in favor of the prison guards and their heirs. (*Id.* at p. 507.)

■ Judge Easterbrook, writing the court's unanimous opinion, reversed the judgments, concluding that although the actions of the prison officials "arguably increased the danger to which the guards were exposed," they did not violate the Constitution. (*Walker, supra,* 791 F.2d at pp. 507, 509.) The court's conclusion turned on the fact that "[t]he defendants did not kill or injure the guards; prisoners did, and this makes all the difference." (*Id.* at p. 509.) The due process clause "does not require the state to guarantee life, liberty, or property against invasion by private actors; it requires only that the state not act, unless with due process, when life, liberty, or property are in the balance." (*Walker,* at p. 509.)

In closing, Judge Easterbrook explained why the court's conclusion did not run afoul of the rule "that the state must protect prisoners and others in its charge." (*Walker, supra,* 791 F.2d at p. 511.) That rule is based on "the principle that '[i]f the state puts a man in a position of danger from private persons and then fails to protect him . . . it is as much an active tortfeasor as if it had thrown him into a snake pit.' " (*Ibid.,* citing *Bowers v. DeVito* (7th Cir. 1982) 686 F.2d 616, 618.) Here, however, "the state did not draft its guards;

they enlisted, on terms they found satisfactory, and they were free to quit whenever they pleased. The state must protect those it throws into snake pits, but the state need not guarantee that volunteer snake charmers will not be bitten. It may not throw Daniel into the lions' den, but if Daniel chooses to be a lion tamer in the state's circus, the state need not separate Daniel from his charges with an impenetrable shield." (*Walker*, at p. 511.)

*Walker* is similar in material respects to O'Dea's case. O'Dea was injured while quelling a prison fight and now seeks to hold prison officials liable under the due process clause because he believes they were "extremely reckless," created a "foreseeable risk of harm to staff and inmates," and made the fight likely to occur.

Regardless of whether O'Dea's allegations are true, the defendants did not injure O'Dea and did not restrain his ability to act. As O'Dea himself admits, he voluntarily enlisted with the former Department of Corrections six years before his career-ending injury, and he was equipped with pepper spray and a baton that he used to subdue the inmates and quell the fight. As in *Walker*, while the acts of the prison officials arguably increased the danger to which O'Dea was exposed, the due process clause simply does not protect O'Dea from Bunnell's, Acuna's, and Baber's acts in this situation.

O'Dea nevertheless contends his claim is not foreclosed by *Walker*, relying on a line of cases postdating *Walker*, beginning with the United State Supreme Court's decision in *DeShaney*. As we will explain, consistent with *Walker*, the cases O'Dea cites do not assist him because defendants did not restrain O'Dea's freedom to act on his own behalf, a necessary component of a section 1983 claim premised on a plaintiff's alleged deprivation of liberty under the substantive component of the due process clause.

In *DeShaney*, the Supreme Court refused to find a due process violation where a county's department of social services failed to adequately protect four-year-old Joshua from a violent beating by his father that left the boy severely brain damaged. (*DeShaney*, *supra*, 489 U.S. at pp. 191, 193 [103 L.Ed.2d at pp. 256–257].) Despite previous suspicious injuries for which Joshua repeatedly had to be hospitalized and the department's decision to place him back with the father after it had removed him once, the Supreme Court held "[a]s a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." (*Id.* at pp. 192–193, 197 [103 L.Ed.2d at pp. 256–257, 259].)

The Supreme Court also rejected Joshua's argument that a " 'special relationship' " existed between him and the state simply because the department knew that he faced the danger of abuse and intended to protect him from that danger. (*DeShaney, supra,* 489 U.S. at pp. 197–198 [103 L.Ed.2d at p. 260].) The court explained that the cases in which it had found a special relationship stood "only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." (*Id.* at pp. 199–200 [103 L.Ed.2d at pp. 261–262], citing *Estelle v. Gamble* (1976) 429 U.S. 97, 103–104 [50 L.Ed.2d 251, 259–260, 97 S.Ct. 285][2] and *Youngberg v. Romeo, supra,* 457 U.S. at p. 310 [73 L.Ed.2d at p. 38][3].)

Central to the court's holding in *DeShaney* was the following reasoning: "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." (*DeShaney, supra,* 489 U.S. at p. 200 [103 L.Ed.2d at p. 262].)

Following this reasoning, the Supreme Court concluded "the State had no constitutional duty to protect Joshua." (*DeShaney, supra,* 489 U.S. at p. 201 [103 L.Ed.2d at p. 263].) Joshua was injured while he was in his father's

---

[2] In *Estelle v. Gamble,* a prisoner filed a section 1983 claim against the prison's medical director/chief medical officer and other prison officials alleging they subjected him to cruel and unusual punishment in violation of the Eighth Amendment based on lack of adequate treatment after he was injured while working in prison. (*Estelle v. Gamble, supra,* 429 U.S. at pp. 98, 101 [50 L.Ed.2d at pp. 256, 258].) In allowing the suit against the medical director/chief medical officer to go forward and remanding the matter to consider whether a cause of action had been stated against the other prison officials, the Supreme Court explained that the government must provide medical care to those whom it punishes by incarceration as they have been deprived of their liberty to care for themselves. (*Id.* at pp. 98, 103–104, 108 [50 L.Ed.2d at pp. 256, 259–260, 262].) The court "conclude[d] that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' [citation], proscribed by the Eighth Amendment." (*Gamble,* at p. 104 [50 L.Ed.2d at p. 260].)

[3] In *Youngberg,* a mentally retarded man filed a section 1983 claim against three administrators of the state institution to which he was committed alleging the administrators knew or should have known he had been injured at least 63 times, they failed to institute appropriate preventative procedures, they failed to provide him with appropriate treatment or programs, and they routinely restrained him for prolonged periods. (*Youngberg v. Romeo, supra,* 457 U.S. at pp. 309–311 [73 L.Ed.2d at pp. 32–34].) The Supreme Court, "consider[ing] . . . for the first time the substantive rights of involuntarily committed mentally retarded persons under the Fourteenth Amendment," concluded that their "liberty interests require the State to provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint." (*Youngberg,* at pp. 314, 319 [73 L.Ed.2d at pp. 36, 39].)

custody, and even though the department had taken Joshua from his father at one point, the state "placed him in no worse position than that in which he would have been had it not acted at all." (*Ibid.* [103 L.Ed.2d at p. 262].) In reaching its conclusion, the court observed that "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." (*Ibid.*)

■ Seizing on this observation in *DeShaney*, other courts, including the Ninth Circuit, have developed what they view as two exceptions to *DeShaney*'s general rule that the state's failure to protect an individual against private violence does not rise to a constitutional violation under the due process clause. (See, e.g., *L.W. v. Grubbs* (9th Cir. 1992) 974 F.2d 119, 120–121 (*Grubbs I*); *Uhlrig v. Harder* (10th Cir. 1995) 64 F.3d 567, 572; *Kathleen R. v. City of Livermore* (2001) 87 Cal.App.4th 684, 699 [104 Cal.Rptr.2d 772].) The first is "the 'special relationship' exception, stemming from a custodial relationship between the state and the victim," and the second is "the 'danger creation' exception, stemming from 'affirmative conduct on the part of the state in placing the plaintiff in danger.' " (*Kennedy v. City of Ridgefield* (9th Cir. 2006) 439 F.3d 1055, 1070 (dis. opn. of Bybee, J.) (*Kennedy*).) It is the danger-creation exception on which O'Dea relies.[4] As we will explain, the mischief that has resulted from indiscriminate application of selected language from cases discussing the danger-creation exception has provided unnecessary fodder for O'Dea to advance his untenable due process claim.

To support his position that the danger-creation exception applies, O'Dea cites a number of cases from the Ninth Circuit that have allowed plaintiffs to go forward with claims against state actors "for their roles in creating or exposing individuals to danger they otherwise would not have faced." (*Kennedy, supra,* 439 F.3d at p. 1062.) These cases include *Wood v. Ostrander* (9th Cir. 1989) 879 F.2d 583, 586 (state trooper arrested drunk driver, impounded the car, and left the passenger by the side of the road in the middle of the night in a high-crime area where she was picked up by a stranger and raped); *Grubbs I, supra,* 974 F.2d at pages 120–121 (supervisors at a custodial institution assigned a high-risk sex offender to work with plaintiff nurse alone in the institution's medical clinic where he raped her, even though the nurse had been informed she would not be left alone with violent offenders); *L.W. v. Grubbs* (9th Cir. 1996) 92 F.3d 894 (*Grubbs II*)

---

[4] The United States Supreme Court "has yet to recognize the state-created danger doctrine." (*Kennedy, supra,* 439 F.3d at p. 1074 (dis. opn. of Bybee, J.).)

(same facts as *Grubbs I*); *Penilla v. City of Huntington Park* (9th Cir. 1997) 115 F.3d 707, 708 (police officers responded to a 911 call regarding a seriously ill man on the porch, found him to be in grave need of medical care, canceled the request for paramedics, broke into his house, moved him inside, locked the door, and left; the man was found dead the next day); *Munger v. City of Glasgow Police Dept.* (9th Cir. 2000) 227 F.3d 1082, 1084–1085 (police ejected a drunk man from a bar late at night into subfreezing temperatures wearing only jeans and a T-shirt and prevented him from driving or reentering the bar where he had left his coat; the man died of hypothermia); and *Kennedy, supra,* 439 F.3d at pages 1057–1058 (plaintiff reported to police that a neighborhood boy molested her daughter, an officer assured her he would provide advance notice of any police contact with the boy's family, police failed to do so until after the contact was made but then told plaintiff he would patrol the neighborhood; in reliance, plaintiff stayed the night at her house and early in the morning the boy shot plaintiff and her husband while they were asleep).

Using language from these cases, O'Dea argues that defendants can be held liable here. Specifically, he points to a passage from *Kennedy* declaring that "state actors may be held liable 'where they affirmatively place an individual in danger,' *Munger* [*v. City of Glasgow Police Dept., supra,*] 227 F.3d at [p]. 1086, by acting with 'deliberate indifference to [a] known or obvious danger in subjecting the plaintiff to it,' [*Grubbs II, supra*], 92 F.3d [at p.] 900." (*Kennedy, supra,* 439 F.3d at p. 1062.)

We cannot agree with a narrow reading of these cases that imposes liability under the due process clause for a state-created danger *simply because* the state actor affirmatively placed the plaintiff in danger with deliberate indifference to a known or obvious danger. In our view, such a reading overlooks the gravamen of a substantive due process claim based on the deprivation of a plaintiff's liberty interests.[5]

---

[5] This is not to say all cases which we have examined can be read as O'Dea suggests. We have come across two which suggest that restraining an individual's ability to act is a necessary component of a section 1983 claim based on the substantive due process clause. (See *Russell v. Gregoire* (9th Cir. 1997) 124 F.3d 1079, 1093, fn. 10 ["a state has no general duty to protect individuals against potential harm by third parties, [citation], unless the state creates the danger and *removes the individual's ability to protect himself* [citation]" (italics added)]; *Weissich v. County of Marin* (1990) 224 Cal.App.3d 1069, 1084–1085 [274 Cal.Rptr. 342] ["the State's failure to prevent harm inflicted by a private actor does not give rise to a cause of action under section 1983, with one possible exception, i.e., *when the State has physically limited the victim's ability to act on his own behalf to protect himself* and has left him in a worse position than before the State acted" (italics added)].)

■ As *DeShaney* teaches, the gravamen of a section 1983 claim based on the substantive component of the due process clause is "the 'deprivation of liberty' " resulting from "the State's affirmative act of restraining the individual's freedom to act on his own behalf." (*DeShaney, supra,* 489 U.S. at p. 200 [103 L.Ed.2d at p. 262].) This requires *both* state action *and* a restraint on the individual's freedom to act for a cognizable claim under section 1983. Put into this perspective, the danger-creation exception is just another way of discussing the requisite component of state action but does not dispense with the requirement that the state action restrain the individual's freedom to act. Therefore, regardless of whether a case can be said to fall under the special relationship exception or the danger-creation exception, if the state has not deprived the plaintiff of liberty by restraining his individual freedom to act on his own behalf, the plaintiff simply does not have a cause of action under section 1983 under either exception.

Viewed in this light, the outcome of at least some of the Ninth Circuit cases O'Dea has cited arguably can be justified because state action restrained the individuals' freedom to act on their own behalf. These include liability for the state trooper in *Wood* for stranding the passenger at the side of the road in the middle of the night in a high-crime area, effectively curtailing her ability to get home safely; the police officer in *Penilla* for removing the serious ill man from his porch and locking him in his house, thereby depriving him of his ability to summon neighbors or passersbys; and the police officers in *Munger* for ejecting a bar patron into subfreezing temperatures and preventing him from driving or reentering the bar.

■ In contrast to these cases, there was no state action in O'Dea's case that restrained him from acting on his own behalf. Even if Bunnell, Acuna, and Baber orchestrated the fight, they did not restrain O'Dea from defending himself as he was equipped with pepper spray and a baton that he used to subdue the inmates and quell the fight. As the Supreme Court has warned, " 'we must never forget, that it is a *constitution* we are expounding' " and our Constitution "deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society. We have previously rejected reasoning that ' "would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States." ' " (*Daniels v. Williams, supra,* 474 U.S. at p. 332 [88 L.Ed.2d at p. 669].) O'Dea's due process claim therefore could not survive summary judgment, and the trial court correctly entered judgment in favor of defendants.

## DISPOSITION

The judgment is affirmed. Defendants shall recover their costs on appeal. (Cal. Rules of Court, rule 8.276(a)(1).)

Scotland, P. J., and Raye, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 8, 2007, S153973.