**James Wilburn FEAGLEY, et al.,**
**Plaintiffs–Appellees,**

v.

**Bill WADDILL, Superintendent, Abilene**
**State School, et al.,**
**Defendants–Appellants.**

No. 88–1172.

United States Court of Appeals,
Fifth Circuit.

April 4, 1989.

Helen R. Bright, Toni Hunter, Asst. Attys. Gen., Jim Mattox, Atty. Gen., Austin, Tex., for defendants-appellants.

David Ferleger, Philadelphia, Pa., for plaintiffs-appellees.

Before GOLDBERG, GARWOOD, and JOLLY, Circuit Judges.

GARWOOD, Circuit Judge:

Defendants-appellants Bill Waddill, Ric Savage, Rodney Oliver, Vernon "Buzzy" Andress, Jimmy Minor, Steven Yeakley, Dennis May, Virginia McPherson, and Secta Gammage (collectively, defendants) appeal the district court's denial of their motion for summary judgment based on qualified immunity. At the same time, plaintiffs-appellees James Wilburn Feagley, Billie Jean Feagley, and the estate of Ellen Darlene Feagley move that the appeal be dismissed. We grant appellees' motion and dismiss the appeal.

### Facts and Proceedings Below

In August 1963, Ellen Darlene Feagley (Darlene), then eleven years old, was involuntarily committed to the Abilene State School, a Texas institution for the mentally retarded, and she remained there as an involuntary resident until her death in 1985. Darlene was severely retarded, suffered from grand mal epilepsy, and was partially paralyzed on her right side. Plaintiffs allege, *inter alia*, that during the last two years of her confinement Darlene was kept in a building that failed to meet even the most elementary standards, that she did not receive adequate medical care or training, that she was unduly restrained, that she was repeatedly injured, and that she was drowned when she was sent without supervision to an unlocked and unstaffed swimming pool on September 18, 1985. Plaintiffs further alleged that each of the defendants, as employees at the Abilene State School, engaged in various courses of conduct and took and failed to take certain actions respecting Darlene, which, among other things, caused her injuries and other physical harm and eventually led to her death. Some of these were alleged to have been knowing or reckless.

On May 12, 1986, plaintiffs filed this action against defendants under 42 U.S.C. § 1983. Plaintiffs sued defendants in both their official and their individual capacities, and in addition to compensatory damages for the allegedly unconstitutional denial of care, infliction of injury, and death of Darlene at the Abilene State School, plaintiffs also sought exemplary damages and declaratory relief. After defendants filed a motion for judgment on the pleadings, the district court dismissed with prejudice the claims against defendants in their official capacities and likewise dismissed the claims for declaratory relief. The district court also ordered plaintiffs to amend their complaint to address the issue of qualified immunity, which plaintiffs did on March 9, 1987.

On July 20, 1987, defendants filed a motion for summary judgment in which they claimed that they were entitled to qualified immunity from suit. On August 24, 1987, the district court denied this motion. Subsequently, on November 19, 1987, defendants filed a second motion for summary judgment. In connection with this second motion, defendants filed a statement of undisputed facts and issues of law that listed as undisputed facts only that in August 1963 her parents had Darlene committed to Abilene State School, a state institution, and that she died there in September 1985. It further generally asserted that plaintiffs' allegations reflected that Darlene suffered from seizures prior to August 1963 and that the complained of conduct by defendants was entirely in the scope of their employment at Abilene State School. Defendants also filed excerpts from several of their own depositions, only one of which had been filed with the district court (or is in the record). *See* Fed.R.Civ.P. 56(c). In response, plaintiffs submitted three affidavits, including one by an expert witness. There was no further filing in respect to the motion by defendants. On February 4, 1988, the district court denied defendants' second motion for summary judgment. In denying this motion, the district court determined that a cause of action under section 1983 had been asserted and that none of the defendants had established entitlement to qualified immunity. On March 2, 1988, defendants filed a notice of appeal along with a motion to stay proceedings pending the outcome of appeal. On March 22, 1988, the district court denied defendants' motion to stay proceedings. However, on April 4, 1988, a motions panel of this Court granted the requested stay and

also ordered that plaintiffs' motion to dismiss the appeal be carried with the case.

### Discussion

■ As a general rule, only a final judgment of the district court is appealable. *See* 28 U.S.C. § 1291. Because the order presently under review, the denial of a motion for summary judgment, is interlocutory rather than final in character, to be appealable it must fall within an exception to section 1291. Under the collateral order doctrine set forth in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), an interlocutory order is appealable if it falls within "that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen,* 69 S.Ct. at 1225–26. Included within that "small class" is the denial of a motion for summary judgment based on qualified immunity "to the extent that it turns on an issue of law." *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 2816–17, 86 L.Ed.2d 411 (1985). Accordingly, if disputed factual issues material to immunity are present, the district court's denial of summary judgment sought on the basis of immunity is not appealable. *See Lion Boulos v. Wilson,* 834 F.2d 504, 509 (5th Cir.1987); *Mahoney v. Hankin,* 844 F.2d 64, 68–69 (2d Cir.1988).

To determine whether this order is appealable, we need to know where, in this particular social and factual matrix, the protections of qualified immunity end and liability begins. In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that the plaintiffs must establish that the defendants' conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known" in order to prevail on their claims against the defendants. *Id.* 102 S.Ct. at 2738. In *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Court further refined the principles of qualified

immunity by holding that the right allegedly violated by the defendant's conduct "must have been 'clearly established' in a more particularized ... sense: The contours of the right must be sufficiently clear that a reasonable official would understand that *what he is doing* violates that right," *id.* 107 S.Ct. at 3039 (emphasis added), an inquiry which the opinion infers may often be "fact specific." *Id.* at 3040.

■ The constitutional rights possessed by an involuntarily committed mentally retarded person include, in addition to "adequate food, shelter, clothing and medical care," the liberty interest in reasonably safe conditions and freedom from undue bodily restraints, and "such training as an appropriate professional would consider reasonable to ensure his safety and to facilitate his ability to function free from bodily restraints." *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 2458–59, 2461–62, 73 L.Ed.2d 28 (1982). The institutionalized retarded person's rights to safety and freedom from bodily restraints, however, "are not absolute; indeed to some extent they are in conflict.... [T]here are occasions in which it is necessary ... to restrain the movement of residents—for example, to protect them as well as others from violence. Similar restraints may also be appropriate in a training program. And an institution cannot protect its residents from all dangers of violence if it is to permit them to have any freedom of movement." *Id.* 102 S.Ct. at 2460 (footnote omitted). Nor need there be a " 'compelling' or 'substantial' necessity" in order to "justify use of restraints or conditions of less than absolute safety," for such a requirement "would place an undue burden on the administration of institutions ... and also would restrict unnecessarily the exercise of professional judgment." *Id.* at 2461. Rather, "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 2462 (footnote omitted). Although *Youngberg*

(which preceded *Harlow, Mitchell,* and *Anderson*) did not present a qualified immunity issue, 102 S.Ct. at 2456 n. 13, the Court there noted, "In an action for damages against a professional in his individual capacity, however, the professional will not be liable if he was unable to satisfy his normal professional standards because of budgetary constraints; in such a situation, good-faith immunity would bar liability. *Id.* at 2462.

Justice Blackmun, in his concurring opinion (joined in by Justices Brennan and O'Connor) in *Youngberg,* noted that although the majority did not address the matter "it would be consistent with the Court's reasoning today" to impose an obligation to provide "such training as is reasonably necessary to prevent a person's pre-existing self-care skills from *deteriorating* because of his commitment." *Id.* at 2464 (emphasis in original). While Justice Blackmun's opinion suggests a disposition on his part to recognize such a right, it ultimately states only that he "would be prepared to listen seriously to an argument that petitioners were constitutionally required to provide that training," although he agreed it was "premature to resolve this constitutional question on this less than fully developed record." *Id.* at 2465. Chief Justice Burger in his *Youngberg* concurrence expressed the view that there was "no constitutional right to training or 'habilitation,' *per se.*" *Id.*

In light of *Youngberg,* we have held that there is no constitutional right to care or treatment "in a least restrictive alternative setting," that "[t]he constitutional minimum standard of habilitation" does not relate to "the qualitative betterment of a retarded person's life," and that " '[w]here the state does not provide treatment designed to improve a mentally retarded individual's condition, it deprives the individual of nothing guaranteed by the Constitution; it simply fails to grant a benefit of optimal treatment that it is under no obligation to grant.' " *Lelsz v. Kavanagh,* 807 F.2d 1243, 1251 (5th Cir.), *rehg. denied,* 815 F.2d 1034, *cert. dismissed,* —— U.S. ——, 108 S.Ct. 44, 97 L.Ed.2d 821 (1987).

In *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), the Court held that negligence on the part of state officials does not suffice to make out any due process violation under the Fourteenth Amendment. *See also Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) (same). The *Daniels* Court recognized that *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), had held that a negligently caused deprivation by state officials *did* amount to a due process violation. 106 S.Ct. at 663. Accordingly, *Daniels* "overrule[d] *Parratt* to the extent that it states that mere lack of due care by a state official may 'deprive' an individual of life, liberty or property under the Fourteenth Amendment." 106 S.Ct. at 665. In *Daniels,* the Court observed that "[h]istorically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty or property." *Id.* (emphasis in original). A later footnote, however, observed that the case did not present the issue of whether "recklessness or 'gross negligence' " would suffice. *Id.* at 667 n. 3. As *Youngberg* was decided after *Parratt* and before *Daniels,* we reject appellees' suggestion that there is a *Youngberg* exception to *Daniels.* *See also DeShaney v. Winnebago County Department of Social Services,* —— U.S. ——, ——, 109 S.Ct. 998, 1012, 103 L.Ed.2d 249 (1989) (dissenting opinion of Justice Brennan, joined by Justices Marshall and Blackmun).[1]

---

1. Justice Brennan's *DeShaney* dissent states in pertinent part:

"*Youngberg*'s deference to a decisionmaker's professional judgment ensures that once a caseworker has decided, on the basis of her professional training and experience, that one course of protection is preferable for a given child, or even that no special protection is required, she will not be found liable for the harm that follows.... Moreover, that the Due Process Clause is not violated by merely negligent conduct, see *Daniels, supra* [*Daniels v. Williams,* 106 S.Ct. 662 (1986) ], and *Davidson v. Cannon,* 474 U.S. 344 [106 S.Ct. 668] [88 L.Ed.2d 677] (1986), means that a social worker who simply makes a mistake of judgment under what are admittedly complex and diffi-

■ In the present case, defendants contend that they are not liable because at worst they were merely negligent. However, this assertion goes more to the merits—whether there was a constitutional deprivation—than to the qualified immunity defense. *See Stevens v. Corbell*, 832 F.2d 884, 890 (1987). Further, the complaint charges more than mere negligence, and the summary judgment record does not reflect an absence of all material issues of fact in this regard. The complaint alleges, among other things, that defendants "have acted with actual malice" and "with gross indifference towards and gross and reckless disregard for" Darlene's "health and safety," that defendants' actions were such a substantial departure from accepted professional judgment as to demonstrate that their decisions were not based on professional judgment, that defendants were aware of Darlene's many injuries but took no steps to prevent many like serious injuries in the future which she suffered, knowingly assigned her to unduly danger-ous living conditions, and knowingly created inadequate and unsafe staffing levels.[2] These allegations are not conclusively refuted by, and indeed find some support in, the sketchy summary judgment evidence. On the basis of the record now before us, we cannot say that there are no triable liability issues or that it is conclusively established that defendants were not guilty of knowing or reckless misconduct or that a reasonable person in defendants' respective positions would not have realized that what he was knowingly doing was such a substantial departure from accepted professional judgment, practice, or standards as to constitute an action not based on professional judgment or was otherwise a violation of Darlene's constitutional rights as established by *Youngberg*. The record at this stage is simply not well enough developed factually for this determination to be made.[3]

Because the record is not sufficiently developed factually to permit us to defini-

cult conditions will not find herself liable in damages under § 1983."

As the above passage—which nothing in the *DeShaney* majority opinion in any way disputes or is inconsistent with—indicates, an assertion that defendants were merely guilty of negligence (professional or otherwise) would not suffice ("the Due Process Clause is not violated by merely negligent conduct").

2. The complaint also alleges that defendants' complained of conduct was "not affected by budgetary constraints"; neither the motion for summary judgment nor its supporting material purports to dispute this allegation. Of course, at trial, a different showing may be made. Similarly, as this case has been presented to us, the relevant conduct has been deemed to be post-*Youngberg* (or at least no contention has been made to us that at any relevant time the general constitutional rights of institutionalized retarded persons as enunciated in *Youngberg* were not clearly established).

3. We by no means imply that defendants may not prevail at trial, either on the merits or on qualified immunity, or even that some or all of them may not be entitled to an instructed verdict, on either of such bases, on some or all of plaintiffs' claims. More complete evidential development may reveal a sufficiently different overall factual context so that what now appears to be material may not be, or so that adverse inferences which might appear proper in the present partial development will appear clearly unwarranted in light of all the circumstances.

Nor do we imply that all of the numerous different complaints made in plaintiffs' lengthy (fifty-seven page) pleading, or all aspects of plaintiffs' summary judgment evidence, are sufficient to state a section 1983 claim. For example, in portions of their pleading and "evidence," plaintiffs seem to complain of a failure to furnish treatment or habilitation of a kind which our *Lelsz* opinion holds the state is not constitutionally required to afford; and there are also certain assertions made which appear to proceed on a negligence (or professional negligence) theory, which is not sufficient. Other allegations—including (but not necessarily limited to) those respecting an inadequate investigation following Darlene's death—likewise appear of questionable sufficiency. However, the point is that—on the record before us—there *are* some triable allegations. Defendants' attack below proceeded on a globular, across-the-board, approach: that they were entitled, as a matter of law, to qualified immunity on everything and that nothing other than mere negligence was alleged. On the present record, defendants' contention is not well taken. That being the case, we decline to use this attempted interlocutory appeal as a vehicle to *sua sponte* parse, one by one, each and every one of the various matters complained of in plaintiffs' second amended complaint, or to furnish in advance a road map for the trial of this case. Suffice it to say that the record before us does not establish defendants' entitlement to be free from trial of this lawsuit.

tively rule on defendants' qualified immunity defense, the issue that we must resolve does not constitute an issue of law as required under *Mitchell.* Accordingly, we determine that the instant order denying defendants' motion for summary judgment does not fit within the collateral order exception to the final judgment rule. We therefore conclude that this appeal must be dismissed.

### Conclusion

For reasons stated above, we determine that the order of the district court denying defendants' motion for summary judgment based on qualified immunity is not an appealable order. Accordingly, the appeal is

DISMISSED.