**REVISED**

United States Court of Appeals,

Fifth Circuit.

Nos. 96-11332, 96-11439.

Dorothy L. OZEE, acting individually as attorney in fact for Louise T. Peter, and as next friend for Louise T. Peter, on behalf of Louise T. Peter individually and all others similarly situated, Plaintiff,

Boyd L. Richie, guardian of the estate of Louise T. Peter, Plaintiff-Appellee,

v.

The AMERICAN COUNCIL ON GIFT ANNUITIES, INC., individually and on behalf of its members, sponsors and all other similarly situated to them, and as successor to The Committee on Gift Annuities, an unincorporated association, et al., Defendants-Appellants,

Dan Morales, Attorney General of Texas, Appellant.

In re AMERICAN COUNCIL ON GIFT ANNUITIES, INC., et al., Petitioners.

April 9, 1997.

Appeals from the United States District Court for the Northern District of Texas.

Before REAVLEY, SMITH and EMILIO M. GARZA, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

This consolidated case consists of an appeal by the various above-listed defendants from the district court's denial of a motion to dismiss, a separate appeal by Northwestern University challenging the denial of summary judgment, a petition by the defendants for a writ of mandamus, an additional appeal by Texas Attorney General Dan Morales from the denial of his motion to intervene as of right, and a motion by Boyd Richie to dismiss the defendants' and Northwestern's appeals. For the reasons stated

below, we dismiss the defendants' and Northwestern's appeals for want of jurisdiction, deny the petition for mandamus, reverse the denial of intervention, and impose sanctions on appeal.

I.

This litigation stems from charitable donations by Louise Peter, a ninety-six-year-old woman, to the Lutheran Foundation of Texas, one of the many defendants. Peter, who suffers from dementia and Alzheimer's disease, inherited a substantial fortune from her brother late in life. Her guardian, Boyd Richie, alleges that soon thereafter, the leaders of the Lutheran Church—Missouri Synod began unscrupulously pressuring Peter to let them manage her money. After resisting for years, she eventually invested $1.7 million with the Lutheran Foundation of Texas. Approximately $1.5 million of this went into a revocable management trust and a charitable remainder unitrust; the remaining $200,000 went to buy charitable gift annuities, the financial products that are the epicenter of this lawsuit.

Charitable gift annuities are hybrids of altruism and capitalism. To purchase one, the donor or "annuitant" writes a check to a charitable organization. The charity, in return, promises to pay the annuitant a fixed stream of income for the remainder of his life. Precisely how much the annuitant will receive per year depends primarily on the size of the "donation" and the annuitant's age—the older he is, the more he receives, because the older he is, the less the time is during which the charity expects to have to pay the annuity.

As with bonds, the annual payout is expressed as a

percentage, which is referred to as the charitable gift annuity rate. Unlike with bonds, however, the principal on which this "interest" is being paid becomes the property of the charity when the check is handed over. In other words, the annuitant trades a "donation" to a charity for a guaranteed stream of income that continues as long as he lives.[1]

In many respects, then, charitable gift annuities are quite similar to the commercial annuities sold by life insurance companies. As with commercial annuities, an annuitant who outlives his actuarial life expectancy stands to reap a substantial profit, the gift portion of the "donation" notwithstanding. The difference is that charitable gift annuities also provide the annuitant a large tax deduction and the satisfaction of having given to the charity of his choice, advantages that the plaintiffs in this case contend make charitable gift annuities competitive with other financial products.

Enter the principal defendant, the American Council on Gift Annuities, Inc. (the "Council"). According to Richie, the Council was formed years ago to suppress competition among charities in setting gift annuity rates, which competition apparently would have had the undesirable effect of causing potential donors to shop for

---

[1]For tax purposes, the Internal Revenue Service ("IRS") considers the initial transfer that starts the charitable gift annuity to be a "bargain sale," i.e., a sale of property for less than its fair market value. The difference between actuarially determined fair market value and the transfer price is considered a gift, and the gift portion of the transfer is required to be at least 10% of the total. Thus the IRS breaks the transaction in two: Part of the transfer is deemed to have purchased a normal commercial annuity that yields taxable income, and part is a tax-deductible charitable gift.

the best rate.  The Council purportedly sets rates that it warns charities not to exceed, actively monitors compliance, and lobbies against government regulation of the charitable gift annuity industry.  Richie thus alleges that the Council is the hub of a vast, sinister price-fixing conspiracy comprising charities across the country.

Dorothy Ozee, Peter's grand-niece and next friend, filed suit in federal district court alleging (1) that the Council and numerous other organizations (hereinafter, "the defendants") had violated § 1 of the Sherman Act by agreeing to fix rates of return on charitable gift annuities;  and (2) a number of supplemental Texas state law claims, including illegal sale of annuities and breach of fiduciary duty.  The defendants moved to dismiss the antitrust claims on the ground that charitable donations do not constitute "trade or commerce" within the meaning of the Sherman Act.[2] The district court denied the motion to dismiss and granted partial summary judgment in Peter's favor on one state law claim of illegal sale of annuities.  A Texas state court later appointed Richie guardian of Peter's estate, so Ozee's name was dropped from the suit, and Richie was substituted as the named plaintiff.

Perhaps recognizing that the denial of their first motion to dismiss did not bode well for their chances of success on the merits, the defendants decided to attack their problem from another angle:  They persuaded both Congress and the Texas Legislature to

---

[2]Section 1 of the Sherman Act provides in relevant part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal...."  15 U.S.C. § 1.

pass bills specifically designed to squelch this suit. The federal bill, which the President signed into law on December 8, 1995, was entitled the Charitable Gift Annuity Antitrust Relief Act (the "Relief Act"), and provided that

> it shall not be unlawful under any of the antitrust laws, or under a State law similar to any of the antitrust laws, for 2 or more persons described in section 501(c)(3) of Title 26 that are exempt from taxation under section 501(a) of Title 26 to use, or to agree to use, the same annuity rate for the purpose of issuing 1 or more charitable gift annuities.

15 U.S.C. § 37(a). Congress made the Relief Act explicitly retroactive. Charitable Gift Annuity Antitrust Relief Act of 1995, Pub.L. No. 104-63, § 4, 109 Stat. 687, 688 (1995). The Texas Legislature passed parallel legislation designed to foreclose Richie's state law claims by retroactively allowing nonprofit organizations to both sell annuities and operate trusts. *See* TEX. BANKING CODE ANN. art. 342-1113(3) (Vernon Supp.1997);[3] TEX.REV.CIV. STAT. ANN. art. 1396-2.31 (Vernon Supp.1997);[4] TEX. INS.CODE ANN. art. 1.14-1A § 2(a)-(b) (Vernon Supp.1997).[5]

---

[3]"The provisions of this chapter shall not affect or apply to ... (3) a corporation serving as trustee of a charitable trust as provided by Article 2.31, Texas Non-Profit Corporation Act (Article 1396-2.31, Vernon's Texas Civil Statutes)." TEX. BANKING CODE ANN. art. 342-1113, -1113(3) (Vernon Supp.1997).

[4]"A corporation that is described by Section 501(c)(3) or 170(c), Internal Revenue Code of 1986, or a corresponding provision of a subsequent federal law, may serve as the trustee of a trust: (1) of which the corporation is a beneficiary; or (2) benefiting another organization described by one of those sections of the Internal Revenue Code of 1986, if the service as trustee is in furtherance of the purposes for which the corporation was formed." TEX.REV.CIV. STAT. ANN. art. 1396-2.31 (Vernon Supp.1997) (footnote omitted).

[5]"Sec. 2. (a) The issuance of a qualified charitable gift annuity does not constitute engaging in the business of insurance in this state. (b) A charitable gift annuity issued before September 1, 1995, is a qualified charitable gift annuity for

Armed with this new legislation, the defendants filed another motion to dismiss and, in the case of defendant Northwestern University ("Northwestern"), a motion for summary judgment. In response, Richie both challenged some of the defendants' § 501(c)(3) exemptions and amended his complaint to allege a price-fixing conspiracy between entities that fit the Relief Act's exemption and entities that do not.[6] The district court issued thirty-five orders, the most important of which, dated September 30, 1996, denied the defendants' motion to dismiss, Northwestern's motion for summary judgment, and Morales's motion to intervene as of right. *See Richie v. American Council on Gift Annuities,* 943 F.Supp. 685 (N.D.Tex.1996). It is from this second refusal to dismiss that the defendants now appeal.

In addition to the defendants' collective appeal from the refusal to dismiss, Northwestern individually appeals the denial of summary judgment. Morales brings a separate interlocutory appeal, arguing that he should have been allowed to intervene as of right under FED. R. CIV. P. 24(a). The defendants (again, collectively) petition for a writ of mandamus, requesting dismissal of both the state and the federal claims on the grounds that the district court abused its discretion by (1) refusing to grant the second motion to dismiss; (2) asserting jurisdiction to consider whether defendants meet the Relief Act's requirements for antitrust exemption; (3)

---

purposes of this article and Article 1.14-1 of this code, and the issuance of that charitable gift annuity does not constitute engaging in the business of insurance in this state." TEX. INS.CODE ANN. art. 1.14-1A § 2(a)-(b) (Vernon Supp.1997).

[6]For convenience, we henceforth refer to such conspiracies as "hybrid" conspiracies.

refusing to grant the first motion to dismiss; and (4) refusing to enter summary judgment on the Texas state law issues. Finally, Richie moves this court to dismiss the defendants' appeals on numerous grounds, most notably for want of appellate jurisdiction.

## II.

## A.

The central issue is this court's jurisdiction to hear the appeal. The statute codifying the final judgment rule, 28 U.S.C. § 1291, provides that "[t]he courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States." Appeal is thereby precluded from decisions that are "tentative, informal, or incomplete," as well as from "fully consummated decisions" that are "but steps towards final judgment in which they will merge." *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949). As the refusal to dismiss is obviously not a "final decision," *Newball v. Offshore Logistics Int'l,* 803 F.2d 821, 824 (1986) (citing *Fluor Ocean Servs. v. Hampton,* 502 F.2d 1169, 1170 (5th Cir.1974)), the only way the defendants can hope to assert jurisdiction is through the collateral order doctrine.

The collateral order doctrine permits appeal of non-final decisions that "fall in that small class [of interlocutory decisions] which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen,* 337 U.S. at 546, 69 S.Ct. at 1225-26. The

doctrine thus allows review of orders that (1) conclusively determine the disputed question; (2) resolve an issue that is completely separate from the merits of the action; and (3) would be effectively unreviewable on appeal from a final judgement. *See Digital Equip. Corp. v. Desktop Direct, Inc.,* 511 U.S. 863, 867, 114 S.Ct. 1992, 1995-96, 128 L.Ed.2d 842 (1994); *see also Cohen,* 337 U.S. at 545-47, 69 S.Ct. at 1224-26. As its stringent requirements indicate, the collateral order doctrine is not to be applied liberally. Rather, the doctrine "is "extraordinarily limited' in its application." *Pan Eastern Exploration Co. v. Hufo Oils,* 798 F.2d 837, 839 (5th Cir.1986) (citation omitted). Moreover—and particularly apposite to this case—appealability under the collateral order doctrine must be determined "without regard to the chance that the litigation might be speeded, or a "particular injustice' averted by a prompt appellate court decision." *Digital Equip.,* 511 U.S. at 868, 114 S.Ct. at 1993.

As a general matter, the refusal to dismiss an action under FED. R. CIV. P. 12(b)(6) is not appealable.[7] Recognizing the predicament in which these decisions place them, the defendants

---

[7]*See, e.g., Morin v. Caire,* 77 F.3d 116, 119 (5th Cir.1996) ("Ordinarily, this court does not have jurisdiction over the denial of a Rule 12(b)(6) motion to dismiss for no cause of action, because such an order is interlocutory in nature."); *Holloway v. Walker,* 765 F.2d 517, 525 (5th Cir.) (same), *cert. denied,* 474 U.S. 1037, 106 S.Ct. 605, 88 L.Ed.2d 583 (1985). *Accord Briggs & Stratton v. Local 232 Int'l Union,* 36 F.3d 712, 714 (7th Cir.1994) ("To the extent the union wants us to review the district court's failure to dismiss the case outright, it hasn't a leg to stand on."), *cert. denied,* --- U.S. ----, 115 S.Ct. 1998, 131 L.Ed.2d 1000 (1995); *Hill v. City of New York,* 45 F.3d 653, 663 (2d Cir.1995); *Figueroa v. United States,* 7 F.3d 1405, 1408 (9th Cir.1993), *cert. denied,* 511 U.S. 1030, 114 S.Ct. 1537, 128 L.Ed.2d 190 (1994).

argue that the Relief Act gives them an immunity from suit and that the refusal to dismiss denied them that immunity, as denials of motions to dismiss on the basis of qualified or absolute immunity frequently are appealable as collateral orders.[8]

The defendants' immunity arguments completely miss the mark, however. After the Relief Act was passed, Richie amended his complaint to allege that some of the defendants had procured their 26 U.S.C. § 501(c)(3) tax-exemption determination letters by fraud, and Richie added some plainly non-charitable defendants so as to allege a conspiracy between § 501(c)(3) exempt entities and non-exempt entities.[9] Accordingly, the order denying the motion to dismiss rested on two grounds: (1) That Richie has at least stated a claim as to the defendants he claims are non-exempt; and (2) that he also states a claim insofar as he alleges a § 1 conspiracy between exempt and non-exempt organizations.

This second ground is important, for even assuming that the Relief Act creates an immunity from suit rather than a substantive rule of decision on the merits (a question we do not reach), the defendants may not reap its benefits. As the Relief Act covers only agreements between "2 or more persons described in section 501(c)(3) of Title 26 that are exempt from taxation under section

---

[8]See *Digital Equip.*, 511 U.S. at 871, 114 S.Ct. at 1997; *Williams v. Collins,* 728 F.2d 721, 724-26 (5th Cir.1984); *see also Mitchell v. Forsyth,* 472 U.S. 511, 524, 105 S.Ct. 2806, 2814, 86 L.Ed.2d 411 (1985); *Nixon v. Fitzgerald,* 457 U.S. 731, 741-43, 102 S.Ct. 2690, 2696-97, 73 L.Ed.2d 349 (1982).

[9]Besides the obviously eleemosynary organizations, Richie's ever-expanding list of defendants includes a number of law firms, insurance companies, and commercial banks that apparently are associated with the administration of charitable gift annuities.

501(a) of Title 26 ...," its plain language does not reach conspiracies involving both exempt and non-exempt entities.

The defendants argue that the statute means something other than what it says, citing a House report suggesting that the exemption was intended to extend to attorneys, consultants, and other professionals retained by a § 501(c)(3) entity. *See* H.R. REP. No. 104-336 (1995), *reprinted in* 1995 U.S.C.C.A.N. 632, 637. We find this suggestion thoroughly unpersuasive. As we stated above, the plain terms of the Relief Act cover conspiracies by § 501(c)(3) organizations only; had Congress wished to exempt hybrid agreements, it easily could have done so. As the plain language of the statute is unambiguous, we need not concern ourselves with its legislative history, which appears not to support the defendants' proposition, in any event.[10] *See United States v. Ron Pair Enters.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); *United States v. Barlow,* 41 F.3d 935, 942 (5th Cir.1994), *cert.*

---

[10]Even were we to look beyond the plain language of the Relief Act, our conclusion that hybrid conspiracies are outside its reach would still be supported by the rule of forfeiture. Under this rule, entities normally exempt from the antitrust laws lose their exemption when they conspire with non-exempt entities. *See Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 231, 99 S.Ct. 1067, 1083, 59 L.Ed.2d 261 (1979). In *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 782-84, 113 S.Ct. 2891, 2901-03, 125 L.Ed.2d 612 (1993), the Court's most recent pronouncement on this subject, the Court drew a distinction between status-based and conduct-based exemptions, finding the rule of forfeiture applicable to the former but not necessarily to the latter. The exemption created by the Relief Act is based on both status ("persons described in section 501(c)(3)") and conduct ("to use, or to agree to use"), and is thus much more like the Capper-Volstead Act, which has both status and conduct elements, than it is like the McCarran-Ferguson Act, which creates a purely conduct-based exemption. Status is the key, and because Richie is alleging a conspiracy in which some entities have the requisite status-based exemption and some do not, the rule applies.

*denied,* --- U.S. ----, 115 S.Ct. 1389, 131 L.Ed.2d 241, *and cert.*
*denied,* --- U.S. ----, 115 S.Ct. 1804, 131 L.Ed.2d 730, *and cert.*
*denied,* --- U.S. ----, 115 S.Ct. 1804, 131 L.Ed.2d 730 (1995);
*Dillon v. Mississippi Military Dep't,* 23 F.3d 915, 919 n. 8 (5th
Cir.1994).

It should be evident, from the above, that because the refusal to dismiss was predicated on Richie's claims of non-exempt defendants and a hybrid conspiracy involving them, the matters it addressed were neither conclusively determined nor separate from the merits of the case. To the contrary, the district court went out of its way to state that it would reconsider the defendants' claims of exemption as soon as there was sufficient evidence to do so. Given that the ruling was based on the possibility of a hybrid conspiracy, we need not consider whether the Relief Act grants § 501(c)(3) organizations some sort of immunity or right not to stand trial. It follows that because the denial of the motion to dismiss did not actually require a finding of no immunity, it is not a collateral order, and we lack jurisdiction to entertain the appeal.[11]

B.

The charitable defendants protest that Richie may not

---

[11]Even were we to assume *arguendo* that the Relief Act legalizes conspiracies between exempt and non-exempt entities, there would not be an appealable immunity issue, as the bases on which Richie has challenged the defendants' § 501(c)(3) determinations are factual. *See Hale v. Townley,* 45 F.3d 914, 918 (5th Cir.1995) ("An appellate court has jurisdiction to review an interlocutory denial of qualified immunity only to the extent that it "turns on an issue of law.' ") (quoting *Mitchell,* 472 U.S. at 530, 105 S.Ct. at 2817); *Feagley v. Waddill,* 868 F.2d 1437, 1439 (5th Cir.1989) (same).

challenge their exempt status, because the district court lacks jurisdiction to reconsider the IRS's determination that they are § 501(c)(3) entities.  In effect, they contend that their letters from the IRS finding them to be § 501(c)(3) entities for tax purposes grant an unassailable, irrevocable status as exempt organizations under the Relief Act, and that no one may litigate this issue.  Even were we to agree with this, the fact that Richie has alleged a conspiracy between exempt and non-exempt entities would deprive us of jurisdiction to hear this appeal.  Our want of jurisdiction, moreover, precludes us from addressing the question of the § 501(c)(3) determination.

### III.

Northwestern University separately appeals the denial of its motion for summary judgment, arguing that it has incontrovertibly demonstrated that it is exempt under the Relief Act. As with the defendants' motion to dismiss, Northwestern's motion was denied by the September 30, 1996, memorandum opinion and order on the bases described above. *See Richie,* 943 F.Supp. at 687-88 n. 1. Also as with the motion to dismiss, the order specifically stated—in boldface, no less—that it was denying Northwestern's motion without prejudice.  The court went out of its way to note that further discovery was necessary before it could "fairly and correctly rule" on the summary judgment motions before it.

Ordinarily, a denial of summary judgment is an unappealable interlocutory order.  *Aldy v. Valmet Paper Mach.,* 74 F.3d 72, 75 (5th Cir.), *cert. denied,* --- U.S. ----, 117 S.Ct. 68, 136 L.Ed.2d 29 (1996);  *Schaper v. City of Huntsville,* 813 F.2d 709, 713 (5th

Cir.1987).  The denial of Northwestern's motion falls squarely within this general rule, for the obvious lack of a conclusive and unreviewable determination renders the collateral order doctrine inapplicable.  To the extent Northwestern argues that the district court disallowed it an immunity defense, its argument is foreclosed by the same factual issues that precluded the motion to dismiss: Richie's allegations that some of the defendants are non-exempt and that exempt entities conspired with non-exempt ones.  As we previously have held, "if disputed factual issues material to immunity are present, the district court's denial of summary judgment sought on the basis of immunity is not appealable." *Feagley,* 868 F.2d at 1439.  In short, then, we lack jurisdiction to hear Northwestern's claims for largely the same reasons that we lack jurisdiction to hear the defendants'.

IV.

In addition to the above appeals, the defendants[12] also petition for a writ of mandamus, alleging that the district court abused its discretion in (1) refusing to grant the second motion to dismiss;  (2) asserting jurisdiction to consider whether defendants meet the Relief Act's requirements for antitrust exemption;  (3) refusing to grant the first motion to dismiss;  and (4) refusing to enter summary judgment on the Texas state law issues.  The relief they seek is dismissal with prejudice of Richie's federal and state claims.

Most of the petition simply recycles the arguments of

---

[12]Although they are technically petitioners with respect to this portion of the case, we will continue to refer to the defendants as defendants in the interests of clarity.

defendants' appeal in the substantially stricter mandamus context. Mandamus is "an extraordinary remedy for extraordinary causes," *United States v. Denson,* 603 F.2d 1143, 1146 (5th Cir.1979) (en banc), and is not intended as a "substitute for appeal," *In re American Airlines,* 972 F.2d 605, 608 (5th Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993). It is not justified merely because "hardship may result from delay or from an unnecessary trial," *In re Fibreboard Corp.,* 893 F.2d 706, 707 (5th Cir. 1990). Rather, the writ issues only where the district court has committed a "clear abuse of discretion" or engaged in "conduct amounting to "usurpation of power.' " *Mallard v. United States District Court,* 490 U.S. 296, 309, 109 S.Ct. 1814, 1822, 104 L.Ed.2d 318 (1989). To succeed, the defendants must show (1) that they lack adequate alternative means to obtain the relief they seek and (2) that their right to issuance of the writ is "clear and indisputable." *Mallard,* 490 U.S. at 309, 109 S.Ct. at 1822; *American Airlines,* 972 F.2d at 608; *Fibreboard,* 893 F.2d at 707.

This the defendants cannot show. As to the first two challenged actions—the refusal to grant the second motion to dismiss and the assertion of jurisdiction over the defendants' status as exempt entities—our discussion above explains why defendants' right to the relief they seek is anything but "clear and indisputable."

They fare little better on the refusal to grant the first motion to dismiss, which was predicated on a finding that the conduct challenged in this case is "trade or commerce" within the meaning of the Sherman Act. As Richie points out, the "exchange of

money for services, even by a nonprofit organization, is a quintessential commercial transaction."  *United States v. Brown Univ.,* 5 F.3d 658, 666 (3d Cir.1993).

The purchasers of charitable gift annuities pay money and receive benefits in return:  the annuity, substantial tax advantages, and the satisfaction of having given to charity.  As the IRS recognizes, at least part of the transaction is undoubtedly commercial, and the transaction as a whole is a far cry from the sort of "antithesis of commercial activity" that it need be in order to fall outside the scope of the Sherman Act. *Brown,* 5 F.3d at 666.

Nor can the defendants succeed in their arguments regarding the summary judgment on Richie's state law claims.  Twenty days after the district court entered that summary judgment, the governor signed into law two pieces of legislation that purport to "clarify" the Texas Insurance Code, the Free Enterprise and Antitrust Act, and the Deceptive Trade Practices Act, so as to leave no doubt that charities need not be licensed insurance companies in order to issue charitable gift annuities.[13]  Much as it might want to, however, the legislature cannot reverse a federal district court.  The defendants, the Texas legislature, and the two state courts that have construed this legislation have consistently vacillated as to whether H.B. 3104 merely "clarified," or instead retroactively changed the law.  They appear to want it both ways:

---

[13]See TEX. BANKING CODE ANN. art. 342-1113, -1113(3) (Vernon Supp.1997);  TEX.REV.CIV. STAT. ANN. art. 1396-2.31 (Vernon Supp.1997);  TEX. INS.CODE ANN. art. 1.14-1A, § 2(a)-(b) (Vernon Supp.1997).

They would like retroactivity to get rid of Richie's suit, and "clarification" so as not to run afoul of the "open courts" provision of TEXAS CONST. art. 1, § 13.

Fortunately, we need not delve into matters of state law, federalism, and separation of powers to resolve this issue, for the defendants have failed to demonstrate that they meet the first requirement for mandamus relief, the unavailability of alternative means. The summary judgment they complain of is addressable both through certified appeal under 28 U.S.C. § 1292(b) and through direct appeal after final judgment. *See In re El Paso Elec. Co.,* 77 F.3d 793, 795 (5th Cir.1996). The grant of summary judgment was neither an abuse of discretion nor an "usurpation of power," and whatever right petitioners might have to relief on the merits is far from being "clear and indisputable." The petition for writ of mandamus is denied.

V.

We have jurisdiction over the appeal of the denial of intervention as of right under FED. R. CIV. P. 24(a), because such orders are appealable collateral orders. *See Edwards v. City of Houston,* 78 F.3d 983, 992 (5th Cir.1996) (en banc) (citing *Ceres Gulf v. Cooper,* 957 F.2d 1199, 1202 n. 5 (5th Cir.1992)). Our standard of review is *de novo. Id.* at 995.

Morales's brief bitterly recounts how he has been left out of this case. As Attorney General, he is charged with representing the public interest in charitable trusts. Under TEX. PROP.CODE ANN. § 123.003 (Vernon 1995), interested parties in proceedings involving charitable trusts must give him notice of the proceeding

by sending him "a certified copy of the petition or other instrument initiating the party's involvement in the proceeding." Richie did this, and Morales received his notice on January 9, 1995.

After that, however, things appear to have gone downhill. Morales apparently was not served with most of the pleadings, and he claims that he was unaware of most of the activity in this case until April 1995, at which time he learned that Richie had filed the motion for partial summary judgment on his state law claims. On April 18, 1995, Morales moved for leave to intervene permissively, and the district court denied his request shortly thereafter. He filed two motions to reconsider this ruling on May 16, 1995, and September 25, 1995, respectively.

On October 17, 1995, Morales filed a second motion for leave to intervene, this time both permissively and as of right. On September 30, 1996, nearly a year later, the district court denied this motion as moot, for the grant of partial summary judgment on Richie's state law claims by then had disposed of all the issues in which the court believed Morales might have an interest. Morales now appeals, challenging only the denial of his motion to intervene as of right.

A.

Morales argues that the district court erred because he meets all the requirements for rule 24(a) intervention: He timely applied; he has an interest in the charitable gift annuities and trusts that are the subject of this suit; disposition of the case without him would impair his ability to protect that interest; and

his interest is not adequately represented by the existing parties. *See* FED. R. CIV. P. 24(a); *Sierra Club v. Espy,* 18 F.3d 1202, 1204-05 (5th Cir.1994); 6 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 24.03[1][b], at 24-23 (3d ed.1997). The test is conjunctive; failure to meet any one of these requirements means that Morales may not intervene as a matter of right. *Sierra Club,* 18 F.3d at 1205 (citing *Kneeland v. National Collegiate Athletic Ass'n,* 806 F.2d 1285, 1287 (5th Cir.), *cert. denied,* 484 U.S. 817, 108 S.Ct. 72, 98 L.Ed.2d 35 (1987)). We agree, however, that he meets each of these criteria.

The first part of the intervention calculus is whether Morales's motion was timely filed. The test for timeliness under Rule 24(a) requires us to consider

(1) The length of time during which the would-be intervenor actually knew or reasonably should have known of his interest in the case before he petitioned for leave to intervene;

(2) The extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case;

(3) The extent of the prejudice that the would-be intervenor may suffer if his petition for leave to intervene is denied; and

(4) The existence of unusual circumstances militating either for or against a determination that the application is timely.

*Edwards,* 78 F.3d at 1000. *Accord* 6 MOORE, *supra,* § 24.21[3], at 24-71. As we stated in *Sierra Club,*

> [This] analysis is contextual; absolute measures of timeliness should be ignored. The requirement of timeliness is not a tool of retribution to punish the tardy would-be intervenor, but rather a guard against prejudicing the original parties by the failure to apply sooner. Federal courts should allow intervention where no one would be hurt and greater justice could be attained.

18 F.3d at 1205 (citations and internal quotations omitted).

Richie attacks Morales's motion on the ground that it is untimely, citing the district court's rejection of his earlier motion to intervene permissively as untimely. Because the first motion was untimely when filed on April 18, 1995, Richie reasons, the second motion cannot possibly have been timely when filed on October 17 of that year.

This is incorrect. We have consistently held that a "district court should apply a more lenient standard of timeliness if the would-be intervenor qualifies for intervention under section (a) [of Rule 24] than if he qualified for intervention under section (b)." *Stallworth v. Monsanto Co.,* 558 F.2d 257, 266 (5th Cir.1977); *see also McDonald,* 430 F.2d at 1073. Given the difference in standards and the fact that this Court reviews timeliness *de novo,* the determination that Morales's first motion was untimely has little or no bearing on the timeliness of his second motion.

Applying the test for timeliness, we find that the first of the four factors is neutral. It does appear that Morales waited over nine months from the time that he received his statutorily mandated notice to the time that he moved to intervene as of right. Timeliness is dependent on the surrounding circumstances, however, and we have rejected the notion that "the date on which the would-be intervenor became aware of the pendency of the action should be used to determine whether it acted promptly." *Sierra Club,* 18 F.3d at 1206; *see also Corley v. Jackson Police Dep't,* 755 F.2d 1207, 1209 (5th Cir.1985). The correct measure of promptness is the extent to which the would-be intervenor delayed

action after it became aware that the original parties would not protect its interests. *Sierra Club,* 18 F.3d at 1206.

Under this standard, Morales's delay was lengthy, but not nearly so lengthy as it appears at first blush. It was not until April 1995 that Richie's summary judgment motion alerted Morales to the immediate danger to his interests. He moved to intervene permissively shortly thereafter, and moved to intervene as of right a few months later, after it became apparent that the court would not permit him to do so permissively. Although his actions in moving to intervene as of right were not as prompt as they could have been, neither were they excessively tardy. The first factor is neutral.

The second factor—prejudice to the existing parties resulting from delay—weighs in Morales's favor. "[P]rejudice must be measured by the delay in seeking intervention, not the inconvenience to the existing parties of allowing the intervenor to participate in the litigation." *Sierra Club,* 18 F.3d at 1206. We fail to see, and Richie has failed to point to, any way in which Morales's delayed entry into the suit will prejudice the existing parties. At most, his entry will cause only inconvenience, which does not weigh into our decision.

The third prong—prejudice to the would-be intervenor—also weighs in favor of Morales. This suit's potential for prejudice to the interests of the people of Texas is obvious. Morales's position is unique, for the people's interests are not represented by any of the existing parties. Although Morales suggests that his course of action in the litigation thus far would have paralleled

that of the charitable defendants, there could quite easily be some point in the litigation at which his interests will diverge. The fourth factor, which weighs "unusual circumstances," is neutral.

The test for timeliness is not a mathematical formula by which a court simply sums its determinations on each of the four factors to reach an answer. *Edwards,* 78 F.3d at 1004. On balance, however, we think that Morales satisfies the test and that his application was timely, particularly in light of the potential for this litigation to prejudice the interests of the people of Texas.

B.

In order to have a sufficient interest in this case to support rule 24(a) intervention, Morales also must demonstrate that he has a "direct, substantial, legally protectable interest in the proceedings." *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.,* 732 F.2d 452, 463 (5th Cir.) (en banc) (quoting *Diaz v. Southern Drilling Corp.,* 427 F.2d 1118, 1124 (5th Cir.1970)), *cert. denied,* 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984). This means that the interest he is asserting must be one that the law recognizes as his. *Id.* at 464. Rule 24(a) also requires him to demonstrate that "disposition of the action may as a practical matter impair or impede [his] ability to protect that interest."

Morales's status as the public protector of charities and charitable trusts satisfies these requirements. *See* TEX. PROP.CODE ANN. §§ 123.001-005 (Vernon 1995). There can be no serious debate that Richie's suit, if successful, would impair the ability of Texas charities to operate, at least until the charities persuade Congress or the legislature to pass additional exemptions for their

conduct.

C.

Under this circuit's caselaw and FED. R. CIV. P. 24(a), Morales also bears a "minimal" burden of showing that his interest is inadequately represented by the existing parties. *Sierra Club,* 18 F.3d at 1207 (citing *Trbovich v. United Mine Workers,* 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 636 n. 10, 30 L.Ed.2d 686 (1972)). He need not show that the existing representation necessarily will be inadequate, but only that it "may be" so. *Id.* This prong of the rule 24(a) test sets a low standard. That he meets it is virtually self-evident, for none of the existing defendants can claim directly to represent the interests of the citizens of Texas.

This leads us to conclude that the district court erred in denying Morales's motion to intervene as of right. The relevant portion of the September 30, 1996, order is therefore reversed.

D.

Morales's final contention is that we should reverse and render judgment on Richie's Texas state law claims. This is effectively an appeal from both the partial summary judgment against the Lutheran Foundation of Texas and the refusal to grant summary judgment for the other defendants. As such, we lack jurisdiction to hear it, and this portion of Morales's appeal is accordingly dismissed.[14]

---

[14]*See Resolution Trust Corp. v. United States Fidelity and Guar. Co.,* 27 F.3d 122, 125 (5th Cir.1994) ("The general rule in the federal courts, of course, is that partial summary judgments are not appealable."); *Bodden v. Osgood,* 879 F.2d 184, 186-87 (5th Cir.1989); *Way v. Reliance Ins. Co.,* 815 F.2d 1033, 1034 (5th Cir.1987).

VI.

Richie's motion to dismiss asks us to acknowledge that the defendants' appeals are frivolous and to award sanctions accordingly. Under FED. R.APP. P. 38, we may award "just damages and single or double costs to the appellee" if we determine that an appeal is frivolous. Unlike sanctions under FED. R. CIV. P. 11, rule 38 sanctions are discretionary.

The threshold consideration is frivolity. In this circuit, a frivolous appeal is either one that pursues legal points not arguable on the merits or one in which the result is obvious.[15]

We find that the defendants' and Northwestern's appeals meet this test. For all their arguments about the Relief Act creating immunity, the defendants and Northwestern have blithely ignored that Richie is alleging some of them to be non-exempt, which creates factual issues, and that he is alleging a hybrid conspiracy. The September 30, 1996, order was unambiguous on this point. Although they throw up a good smoke screen, it defies reality for the defendants to continue to argue that they can collaterally appeal the district court's ruling in the face of its true basis.

As the district court correctly noted, it has never been at issue in this case whether a *bona fide* § 501(c)(3) organization is exempt from liability under the Relief Act. Rather, the real issue

---

[15]*See Olympia Co., Inc. v. Celotex Corp.,* 771 F.2d 888, 893 (5th Cir.1985), *cert. denied,* 493 U.S. 818, 110 S.Ct. 73, 107 L.Ed.2d 39 (1989); *Coghlan v. Starkey,* 852 F.2d 806, 810 (5th Cir.1988) (per curiam) (stating that rule 38 sanctions are appropriate where the outcome of the appeal "is obvious from the comprehensive and decisive exposition of the law by the judge below").

has been, and continues to be, whether the defendants are genuine § 501(c)(3) organizations within the meaning of the Act, and whether any agreements they may have made meet the test for exemption. The briefs in this case are voluminous, and the pleadings filed in the district court even more so. As the district court's response to the petition for mandamus put it, "[T]he paper keeps flowing and the meter keeps running. There are 765 documents filed thus far in the district court and my docket sheet in this case rocks on for 116 pages." Yet nowhere do the defendants come to grips with the real issues.

In light of this, we deem it appropriate to assess sanctions that, though not fully compensatory of Richie's costs, are nonetheless substantial enough unequivocally to alert the defendants to the error of their ways. *See Atwood v. Union Carbide Corp.,* 850 F.2d 1093, 1094 (5th Cir.1988) (per curiam) (assessing attorney's fees "that are more than nominal but considerably less than fully compensatory"), *cert. denied,* 489 U.S. 1079, 109 S.Ct. 1531, 103 L.Ed.2d 836 (1989). The defendants and Northwestern shall pay to Richie $15,000 in partial compensation of his costs and attorney's fees.[16] Counsel for the defendants and Northwestern are admonished henceforth to undertake a more thorough examination of both the decision being appealed and the rules governing our appellate jurisdiction.

VII.

---

[16]We note, in the interest of clarity, that by "defendants and Northwestern" we do not mean to refer to Morales, who was not a defendant in the district court and whose appeal is not frivolous.

In summary, Richie's motion to dismiss is GRANTED, and the defendants' and Northwestern's appeals accordingly are DISMISSED. Pursuant to rule 38, the defendants and Northwestern are SANCTIONED $15,000 for their frivolous appeals and are hereby ORDERED to remit that sum to Richie. The petition for writ of mandamus is DENIED. The order denying Morales's motion to intervene as of right is REVERSED, and this case is REMANDED for further proceedings consistent with this opinion.